Efrain RIVERA–VEGA, et al.,
Plaintiffs–Appellees,

v.

CONAGRA, INC., et al., Defendants–
Appellants.

No. 95–1266.

United States Court of Appeals,
First Circuit.

Heard July 31, 1995.

Decided Nov. 21, 1995.

Roger J. Miller, with whom McGrath, North, Mullin & Kratz, P.C., Omaha, NE, Angel Muñoz–Noya and Lespier & Muñoz–Noya, San Juan, PR, were on brief for appellants.

Robert Tendrich, Attorney, National Labor Relations Board, with whom Frederick L. Feinstein, General Counsel, Mary Joyce Carlson, Deputy General Counsel, Barry J. Kearney, Acting Associate General Counsel, Ellen A. Farrell, Assistant General Counsel, and Corinna L. Metcalf, Deputy Assistant General Counsel, National Labor Relations Board, Washington, DC, were on brief for appellees.

Before TORRUELLA, Chief Judge, BOUDIN and STAHL, Circuit Judges.

TORRUELLA, Chief Judge.

The respondent companies appeal an Order of the district court granting temporary injunctive relief to the Regional Director of the National Labor Relations Board under § 10(j) of the National Labor Relations Act. The district court found reasonable cause to believe that the respondents violated their duty to bargain in good faith by refusing to provide the bargaining representative of its employees with requested financial documents. Based substantially on this violation, the district court issued a preliminary injunction. Finding neither clear error nor abuse of discretion, we affirm.

## I.

### BACKGROUND

Molinos de Puerto Rico, Inc. ("MPR") is a wholly owned subsidiary of ConAgra, Inc. (collectively, the "respondents").[1] MPR maintains three production facilities in Puerto Rico where it mills, sells and distributes wheat, corn flour, and animal feed. In June 1993, Congreso de Uniones Industriales de Puerto Rico ("the union") and the respondents began negotiations for a new collective bargaining agreement, covering unit employees at MPR, to replace an existing agreement, which was nearing expiration. The parties soon became involved in a dispute over wages and benefits—respondents wanted to cut them, and the union sought increases. On several occasions, the union requested MPR's audited financial statements for the past five years to evaluate respondent's bargaining position. Respondents repeatedly refused to provide the requested information, and after four months of bargaining and 18 bargaining sessions, declared an impasse on October 28, 1993. On October 29, respondents informed the union that forty employees would be laid off on November 1st. On November 1st, respondents locked out employees reporting to work at MPR. Respondents subsequently hired replacement workers and continued operations.[2]

The union filed an unfair labor practice charge with the National Labor Relations Board (the "NLRB"). The NLRB issued an unfair labor practice complaint on March 25, 1994, which charged that the respondents, as joint employers, violated §§ 8(a)(1), (3) and (5) of the National Labor Relations Act (the "NLRA"), 29 U.S.C. §§ 158(a)(1), (3), and (5), by, *inter alia,* failing to bargain in good faith when it refused to provide the union with the requested financial information, unilaterally changing the terms and conditions of employment before impasse was reached, unlawfully laying off 40 employees, and imposing a lockout and replacing employees with temporary employees to compel acceptance of its bargaining position. An administrative law judge ("ALJ") conducted a hearing on the matter from May 9 to 13, 1994.[3] On June 10, 1994, the NLRB petitioned the district court for a temporary injunction pursuant to section 10(j) of the NLRA, 29 U.S.C. § 160(j).

After a hearing, the district court issued a comprehensive and detailed opinion in which it found reasonable cause to believe, *inter alia,* that: (1) respondents violated §§ 8(a)(1) and (5) by refusing to provide the requested financial information to the union; (2) the refusal to furnish the financial statements precluded valid impasse; (3) respondents violated § 8(a)(5) by making unilateral changes in the terms and conditions of employment when no valid impasse existed; and (4) respondents violated §§ 8(a)(3) and (1) by locking out employees, and using replacements, in furtherance of its tainted bargaining position. The court further concluded that the standards for issuance of a preliminary injunction were met, and that such relief was just and proper to preserve the NLRB's ability to provide meaningful relief in the underlying unfair labor practice action. Finally, the court found reasonable cause to believe that MPR and ConAgra, Inc., are

---

1. The district court found reasonable cause to believe that the two corporate entities are "joint employers" in the context of labor relations. As discussed *infra,* this finding is not clearly erroneous and is, accordingly, affirmed. We therefore refer to the two companies jointly as the respondents. In addition, we note that the district court's finding of joint employers applies to ConAgra, Inc., and/or Conagra Grain Processing Companies, Inc. For convenience sake only, we refer simply to "ConAgra."

2. Respondents argued to the district court that the lockout was implemented in lieu of the lay-off, and that the lay-off never occurred. The district court appears to have rejected this argument: "The problem with this theory is that at no time have Respondents stated to the Union that the lay-off contemplated in the implementation of their final offer has been set aside. Thus, the number of employees in the unit remains currently at minus forty employees." We find the record unclear on this question. Because resolution of this issue is unnecessary for purposes of our decision, we consider only the fact that respondents announced the lay-offs, and not whether the lay-offs were actually implemented.

3. The ALJ issued a decision on June 13, 1995. The ALJ found that respondents committed various unfair labor practices, many of which are relevant to the issues in this appeal. We take judicial notice of the ALJ's decision.

joint employers for the purposes of labor relations.

The district court issued a temporary injunction, pending a final resolution by the NLRB of the unfair labor practice action, directing the employer, upon request, to: (1) meet and bargain with the union; (2) restore working conditions which existed prior to October 28, 1993, and maintain them until the parties bargain in good faith to an agreement or an impasse on the changes; (3) provide the union with all requested information necessary and relevant for collective bargaining; and (4) reinstate locked out or terminated employees. Respondents' motion for a stay pending appeal was denied by the district court on March 6, 1995, and subsequently by this court on March 20, 1995.

## II.

### STANDARD OF REVIEW

■ Section 10(j) of the NLRA authorizes the NLRB to seek, and the United States district courts to grant, interim relief pending the NLRB's resolution of unfair labor practices. *See* 29 U.S.C. § 160(j).[4] In considering a petition for interim relief under § 10(j), a district court must limit its inquiry to (1) whether the NLRB has shown "reasonable cause" to believe that the employer has committed the unfair labor practices alleged, and (2) whether injunctive relief is "just and proper." *See Pye on Behalf of N.L.R.B. v. Sullivan Bros. Printers, Inc.*, 38 F.3d 58, 63 (1st Cir.1994) (collecting cases). In determining whether the NLRB has shown reasonable cause, the district court does not decide whether an unfair labor practice actually occurred; rather, its role is limited to determining only whether the NLRB's position is "fairly supported by the evidence." *Id.* (quoting *Asseo v. Centro Médico Del Turabo*, 900 F.2d 445, 450 (1st Cir.1990)). The district court does not resolve contested issues of fact, deferring instead to the NLRB's

version of the facts if they are "within the range of rationality." *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 958 (1st Cir.1983). We review the district court's conclusion that reasonable cause exists only for clear error, and examine its decision to grant equitable relief only for abuse of discretion. *Sullivan Bros.*, 38 F.3d at 63; *Centro Médico Del Turabo*, 900 F.2d at 450.

## III.

### DISCUSSION

#### A. Duty to Disclose Financial Information

■ Sections 8(a)(5) and (d) of the NLRA make it an unfair labor practice for an employer to refuse to bargain in good faith with its employees' representative. 29 U.S.C. § 158(a)(5), (d). One element of the duty to bargain in good faith is that the employer must, upon request, supply relevant information needed by the union "for the proper performance of its duties as the employees' bargaining representative." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Indus.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967); *Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1092 (1st Cir.1981). The purpose of this rule is to "enable the [union] to understand and intelligently discuss the issues raised in bargaining." *Soule Glass*, 652 F.2d at 1092 (quoting *San Diego Newspaper Guild v. NLRB*, 548 F.2d 863, 866 (9th Cir.1977)). Information relating to wages, hours, and other terms and conditions of employment is presumptively relevant and necessary for the union to perform its obligations. *Teleprompter Corp. v. NLRB*, 570 F.2d 4, 8 (1st Cir.1977); *F.A. Bartlett Tree Expert Co., Inc.*, 1995 WL 238413, *2 (NLRB).

■ No such presumption exists with respect to financial data. Because of the

---

4. Section 10(j) provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States ... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

sensitive nature of a company's financial data, the general rule is that such information need not be disclosed unless the bargaining representative first makes a showing that "it is specially relevant to the bargaining taking place." *Teleprompter Corp.*, 570 F.2d at 8 (citing *Int'l Woodworkers v. NLRB*, 263 F.2d 483 (D.C.Cir.1959) (Burger, J.)). If the employer itself puts profitability into issue by claiming an inability to pay an increase in wages, however, then the financial information is presumptively relevant to the bargaining process, and the employer is required to substantiate its economic condition. *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152–53, 76 S.Ct. 753, 755–56, 100 L.Ed. 1027 (1956); *Teleprompter Corp.*, 570 F.2d at 7. The Supreme Court has explained the rationale for this rule as follows:

> Good faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.

*Truitt Mfg.*, 351 U.S. at 152–53, 76 S.Ct. at 755–56.[5]

Circuit courts interpreting *Truitt* have long distinguished between cases in which an employer claims an inability to pay the requested wage increase and those in which the employer maintains that complying with the union's request would place it at a competitive disadvantage, ordering disclosure in the former but denying it in the latter. *See, e.g., NLRB v. Harvstone Mfg. Corp.*, 785 F.2d 570, 575–79 (7th Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986); *Buffalo Concrete*, 276 N.L.R.B. 839, 1985 WL 46320 (1985), *enfd.*, 803 F.2d 1333 (4th Cir. 1986). In two recent cases, the NLRB recognized, and elaborated upon the parameters of, this dichotomy.

In *Nielsen Lithographing Co.*, 305 N.L.R.B. 697, 1991 WL 253920, *enfd. sub*

*nom. Graphic Communications Int'l Union, Local 508 v. NLRB*, 977 F.2d 1168 (7th Cir. 1992), the NLRB held that a mere claim of competitive disadvantage does not compel an employer to open its financial records to a union. The NLRB explained:

> The employer who claims a present inability to pay, or a prospective inability to pay during the life of a contract being negotiated is claiming essentially that it cannot pay. By contrast, the employer who claims only economic difficulties or business losses or the prospect of layoffs is simply saying that it does not want to pay.
>
> We do not say that claims of economic hardship or business losses or the prospect of layoffs can never amount to a claim of inability to pay. Depending on the facts and circumstances of a particular case, the evidence may establish that the employer is asserting that the economic problems have led to an inability to pay or will do so during the life of the contract being negotiated.... The distinction has always been between claims of 'cannot' and will not.

*Nielsen*, 305 N.L.R.B. at 701. Thus, under *Nielsen*, an employer must disclose financial information to the union if the employer has asserted that it "cannot pay" wage increases, but need not do so if it has asserted only that it "will not pay" wage increases.

In *The Shell Company*, 313 N.L.R.B. 133 (1993), 1993 WL 491815, the NLRB made explicit what was implicit in *Nielsen*—namely, that the critical inquiry in the "cannot pay"/"will not pay" distinction is the *substance* of the employer's bargaining position, not the formal words used by the employer.

In *Shell*, the employer consistently stated that "it was not pleading poverty or inability to pay in the negotiations, but was simply adopting a firm position in order to become more competitive in the short run and in the future." *Id.* at *6. The NLRB nevertheless concluded:

> Although the [company] referred to economic disadvantages it had in relation to other competitors, ... the testimony re-

---

5. The court also stressed that the right to disclosure in inability-to-pay cases was not automatic: "Each case must turn on its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *Id.* at 153–54, 76 S.Ct. at 756. (footnote omitted).

veals that the essential core of the [company's] bargaining posture as a whole, as expressed to the Union, was grounded in assertions amounting to a claim that it could not economically afford the most recent contract at its Airport operation, that it was faced with a present threat to that operation's survival, and that, therefore, it was at present unable to pay those terms in the successor contract.

*Id.* at *1. *See also New York Printing Pressmen and Offset Workers Union No. 51 v. NLRB,* 538 F.2d 496, 500 (2d Cir.1976) ("So long as the Employer's refusal reasonably interpreted is the result of financial inability to meet the employees' demand rather than simple unwillingness to do so, the exact formulation used by the Employer in conveying this message is immaterial.").

The facts upon which the NLRB relied in *Shell* were that the employer's bargaining representative told the union negotiator during negotiations for the new collective bargaining agreement that (1) economic conditions had affected the company "very badly, very seriously"; (2) present circumstances at the company's Airport were "bad," "critical" and a matter of "survival"; and (3) the company was losing business, had lost an important customer, and was facing serious regulatory and cost problems. He also said: "we are telling you this because we need your help, your assistance, because of this condition." In addition, the NLRB found it significant that the employer expressly referred to steps it had already taken to address the threats to its survival; namely, that it had put a hiring freeze on all management and employee positions, and implemented an early retirement plan. *Id.*

Based on these statements, the ALJ concluded:

The Company's situation at the Airport was continually described as "critical" and a matter of "survival." Critical certainly denotes a degree of urgency or crisis, and when used with survival, denotes a situation in medical terms that would indicate the patient is in imminent danger of dying, or in the case of the Airport operation, closing down. I do not think a reasonable person could hear Respondent's represen-

tatives describe the airport situation as critical and one of survival, and believe that they were speaking of some event that might occur at some point three years or more in the future.

*Id.* at *31.

▮ The district court found the instant action similar to *Shell.* The court concluded that "[w]hile Respondents continuously reiterated that they needed to remain competitive and denied claiming inability to pay, the 'essential core' of its bargaining posture was in effect that it could not afford the terms of the successor contract." The district court based this conclusion upon the substance of the message communicated by respondents to the union over the course of the four month bargaining period. In particular, the district court noted the following allegations by the NLRB.

During the first bargaining session, the negotiator for respondents spoke of the difficult situation facing the company and stated "if we don't take immediate measures there is a probability that we won't be here in the future." Respondents' negotiator also suggested that ConAgra, Inc., was considering closing the mill in Puerto Rico and bringing in flour directly from the United States. In addition, respondents' negotiators made the following statements during the course of bargaining: (1) "The situation is a serious one and fragile."; (2) "If we are not competitive we cannot survive."; (3) "Things like this [the need to eliminate the granting of a soap bar to employees] are what makes us not competitive vis-à-vis the other and could make us have to close shop because we cannot compete."; and (4) "We see the situation as quite risky because of our ability to be competitive." The court also found it significant that, during negotiations, respondents told the union that it was necessary to significantly reduce the number of employees, and then, a day after it declared impasse, told the union that it had decided to lay-off forty employees (almost 30% of the unit) because of its economic position.

Based on the foregoing, the district court determined that the NLRB had shown reasonable cause to believe that the employer had committed an unfair labor practice by

not disclosing the requested financial information. As noted previously, the district court's role in this matter was not to determine whether an unfair labor practice actually occurred, but to determine whether the NLRB's position is "fairly supported by the evidence." *Sullivan Bros.*, 38 F.3d at 63 (quoting *Centro Médico*, 900 F.2d at 450). On this record, we cannot conclude that the district court's conclusion was clearly erroneous.

Moreover, we think our conclusion, reached after independently reviewing the record, is confirmed by the fact that the ALJ, who held a hearing and took evidence on the NLRB's allegations, concluded that the respondents violated §§ 8(a)(5) and (1) by refusing to provide the union with the requested financial information. Specifically, the ALJ found that the facts of the instant case "fall closer to *Shell* than *Nielsen*, thereby bringing it 'within the gravitational field of *Truitt.*' "

Respondents' most compelling argument on appeal is that, during the bargaining process, their negotiators consistently used the phrase "long term" when discussing MPR's prospects for survival. The difficulty with this argument is that the proposed agreement under negotiations was for a period of five years. While it might be argued that the phrase "long term" implies a time more than five years hence, it can just as persuasively be argued that to most workers—as opposed to, for example, a corporate executive in charge of strategic planning—"long term" suggests next year, the year after, etc. The question under *Nielsen* and *Shell* is whether the "essential core" of the employer's bargaining position amounts to a claim of a present inability to pay, *or of a prospective inability to pay during the life of a contract being negotiated. Nielsen*, 305 N.L.R.B. at

701; *Shell*, 1993 WL 491815, at *1–2. We cannot say that the district court's conclusion in this regard is clearly erroneous. *See Shell*, 1993 WL 491815, *31 ("I do not think a reasonable person could hear Respondent's representatives describe the airport situation as critical and one of survival, and believe that they were speaking of some event that might occur at some point three years or more in the future.").[6]

### B. *Impasse*

An employer violates §§ 8(a)(1) and (5) of the NLRA by unilaterally changing a condition of employment that is the subject of negotiations, or refusing to negotiate on a mandatory bargaining topic. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). "The principal exception to this rule occurs when the negotiations reach an impasse: when impasse occurs, the employer is free to implement changes in employment terms unilaterally so long as the changes have been previously offered to the union during bargaining." *Bolton–Emerson, Inc. v. NLRB*, 899 F.2d 104, 108 (1st Cir.1990) (quoting *Huck Mfg. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982)). An impasse exists when, after good faith bargaining, "the parties are deadlocked so that any further bargaining would be futile." *Id.* (citing *Gulf States Mfg., Inc. v. NLRB*, 704 F.2d 1390, 1398 (5th Cir.1983)).

We have upheld, as not clearly erroneous, the district court's finding of reasonable cause to believe that respondents had a duty to disclose the requested financial information, and that their failure to do so constituted a failure to bargain in good faith with the union in violation of § 8(a)(5) of the NLRA. *See Truitt*, 351 U.S. at 152–53, 76 S.Ct. at 755–56 (employer's refusal to pro-

---

**6.** Pursuant to the district court order, the parties have agreed to a confidentiality agreement with respect to the financial information. This agreement moots many of respondents' arguments with respect to the financial information. Moreover, we reject respondents' contention that it was excused from disclosing the information during negotiations because the union resisted a confidentiality agreement. The record as a whole indicates that respondents' willingness to disclose the information, subject to a confiden-

tiality agreement, was tied to its insistence that the union first demonstrate the relevancy of the documents, and its rejection of the union's assertion that the information was relevant to substantiate respondents' assertion that it was unable to pay the increased wages. Thus, even if the union had agreed to a confidentiality agreement, respondents' would not have disclosed the information because it rejected the union's relevancy showing.

**162**

duce financial records to substantiate claim of inability to pay increased wages may support finding of failure to bargain in good faith); *Teleprompter,* 570 F.2d at 8 n. 2 (noting that *Truitt* has become "widely accepted" as establishing an "automatic" rule of disclosure in inability to pay cases). *See also Katz,* 369 U.S. at 747, 82 S.Ct. at 1113–14 (rejecting contention that a finding of subjective bad faith is a prerequisite to a conclusion that employer violated § 8(a)(5)). The district court found reasonable cause to believe that respondents' failure to bargain in good faith precluded valid impasse from occurring. *Cf. New York Printing,* 538 F.2d at 501 (there can be no genuine impasse where employer has failed to bargain in good faith by refusing to disclose properly requested financial information); *NLRB v. Palomar Corp.,* 465 F.2d 731, 735 (5th Cir.1972) (no valid impasse because, "in refusing to disclose their financial records to the Union, [respondents] failed to bargain in good faith as required by" the NLRA). Based on the foregoing considerations, we conclude that this finding is not clearly erroneous.

## C. *The Unilateral Changes in Conditions of Employment and the Lockout*

■ An employer violates its bargaining obligation under §§ 8(a)(1) and (5) if, without having negotiated to impasse, it unilaterally changes its employees' terms or conditions of employment. *Katz,* 369 U.S. at 743, 82 S.Ct. at 1111. The district court in this case found reasonable cause to believe that respondents implemented the following unilateral changes: alteration of the form of employee payment from cash to check; refusal to provide employees with contractual Thanksgiving turkey, and the payment of accrued vacation time; termination of medical plan coverage for locked out employees; and a lay-off of forty employees. With exception of the last question, *see infra* n. 2, each of these findings is "fairly supported by the evidence," *see Centro Médico Del Turabo,* 900 F.2d at 450, and therefore not clearly erroneous. Because we uphold the district court's finding of reasonable cause to believe that impasse did not exist, we also uphold its finding of reasonable cause to believe that

respondents' unilateral changes to the terms and conditions of employment violated § 8(a)(5).

■ There is no dispute that respondents locked-out their employees and hired replacement workers. The district court found reasonable cause to believe that the purpose of the lockout was to compel acceptance of respondents' tainted bargaining position (i.e., its failure to disclose the properly requested financial information), and therefore found reasonable cause to believe that the lockout, and use of replacements, constituted an unfair labor practice.

■ The district court properly recognized that a lockout motivated by an employer's desire to bring economic pressure to bear in support of its legitimate bargaining posture is lawful. *See American Ship Building Co. v. NLRB,* 380 U.S. 300, 312–13, 85 S.Ct. 955, 964–65, 13 L.Ed.2d 855 (1965). The district court also recognized, however, that a lockout with a proscribed purpose is illegal. *See id.* at 313, 85 S.Ct. at 964–65 (to find that lockout violates § 8(a)(3) NLRB must find that the employer acted for a "proscribed purpose").

The disagreement that led to the lockout concerned wages. We have upheld the district court's finding of reasonable cause to believe that the sticking point was respondents' insistence that it could not pay increased wages, and its illegal refusal to substantiate this claim. Thus, the district court found reasonable cause to believe that the lockout in this case was motivated by respondents' desire to compel acceptance of their illegally tainted bargaining position. There is no question that a lockout under such circumstances violates § 8(a)(3) of the NLRA. *See, e.g., American Cyanamid Co. v. NLRB,* 592 F.2d 356, 364 (7th Cir.1979); *Movers & Wrhsemen's Ass'n v. NLRB,* 550 F.2d 962, 966 (4th Cir.), *cert. denied,* 434 U.S. 826, 98 S.Ct. 75, 54 L.Ed.2d 84 (1977); *NLRB v. Bagel Bakers Council,* 434 F.2d 884, 888–89 (2d Cir.1970), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971); *NLRB v. Southern Beverage Co.,* 423 F.2d 720 (5th Cir.1970). We therefore conclude that the district court's finding of rea-

sonable cause with respect to the lockout was not clearly erroneous.

### D. *Joint Employers*

■ The district court found reasonable cause to believe that MPR and ConAgra, Inc., are joint employers. "A joint employer relationship exists where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment." *Holyoke Visiting Nurses Ass'n v. NLRB*, 11 F.3d 302, 306 (1st Cir.1993) (citing *Rivas v. Federación de Asociaciones Pecuarias de Puerto Rico*, 929 F.2d 814, 819–20 (1st Cir.1991)). *See also Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898–99, 11 L.Ed.2d 849 (1964); *NLRB v. Browning–Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982).

In *Holyoke Nurses* and *Rivas*, this court favorably acknowledged a host of factors used by other courts in determining the existence of joint employer status. *See Holyoke Nurses*, 11 F.3d at 306; *Rivas*, 929 F.2d at 820–21. Those factors include: supervision of the employees' day-to-day activities; authority to hire, fire, or discipline employees; authority to promulgate work rules, conditions of employment, and work assignments; participation in the collective bargaining process; ultimate power over changes in employer compensation, benefits and overtime; and authority over the number of employees. *See W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (7th Cir.1988); *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 138–39 (2d Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986); *Ref–Chem Co. v. NLRB*, 418 F.2d 127, 129 (5th Cir. 1969).

■ Whether joint employer status exists is essentially a factual question. *Holyoke Nurses*, 11 F.3d at 306. As noted previously, in the context of a § 10(j) petition for interim relief, the district court does not resolve contested issues of fact, but instead defers to the NLRB's version of the facts if they are "within the range of rationality." *Maram*, 722 F.2d at 958.

■ In this case, the district court found that MPR is a wholly owned subsidiary of ConAgra, uses its logo, holds itself out to the public as a ConAgra enterprise, and has some directors who also hold positions at ConAgra. The court also found that the impetus for respondents' decision to seek wage and benefit cuts in the new bargaining session was a change in the organizational structure of ConAgra, pursuant to which MPR would be part of more than sixty companies known as ConAgra Grain Processing Company, and subsequently be compared to them.

Significantly, the court found that ConAgra's Vice–President of Human Resources, Raymond Godbout ("Godbout") was responsible for the negotiation strategy utilized during the bargaining sessions, and acted throughout as an advisor to MPR's negotiator. Moreover, the court found that Godbout actively participated in the bargaining sessions, and on one occasion stated to the union representative: "what I would like to do is go back to my people and talk with the persons at the corporate level.... See if we can sharpen the pencil and present to you what our position is." In addition, the court found that the drug policy proposed during negotiations was the same policy used by ConAgra at its other plants, and that MPR's employees have the same pension plan as that of ConAgra employees. The court further found that, after the lockout, Godbout became the "de facto spokesperson" for the respondents, and that henceforth ConAgra was determining labor policies for MPR through Godbout. The court also found that, after the lockout, replacement workers were provided and paid by ConAgra.

Based on these factors, the court found reasonable cause to believe MPR and ConAgra are joint employers for purposes of the pertinent collective bargaining negotiations. The court's factual findings are "fairly supported by the evidence," *see Sullivan Bros.*, 38 F.3d at 63, and its finding of reasonable cause is not clearly erroneous.

### E. *The Preliminary Injunction*

■ The district court properly recognized and applied the test for determining

whether interim relief is "just and proper" under § 10(j). The determination of whether injunctive relief is just and proper hinges upon whether the NLRB has demonstrated: (1) a likelihood of success on the merits; (2) the potential for irreparable injury in the absence of relief; (3) that such injury outweighs any harm preliminary injunctive relief would inflict on the employer; and (4) that preliminary relief is in the public interest. *Sullivan Bros.*, 38 F.3d at 58 (collecting cases). When, as in this case, the interim relief sought by the NLRB "is essentially the final relief sought, the likelihood of success should be *strong*." *Id.* (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 25 (1st Cir.1986)).

It is well settled that "we scrutinize a district court's decision to grant or deny a preliminary injunction under a relatively deferential glass." *Feinstein v. Space Ventures, Inc.*, 989 F.2d 49, 51 (1st Cir.1993) (quoting *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988)). Unless the district court has made a mistake of law or abused its discretion, we will not disturb its decision. *See Sullivan Bros.*, 38 F.3d at 63–64; *Feinstein*, 989 F.2d at 51. With these principles in mind, we review the district court's decision that interim relief under § 10(j) was just and proper.

The district court plainly did not abuse its discretion in finding a strong likelihood that the NLRB will succeed on the merits of its unfair labor practice claims. The court meticulously and comprehensively applied the appropriate legal standards to the NLRB's allegations. Respondents challenge to the district court's finding in this regard is limited to a rehash of their arguments that the court clearly erred in finding reasonable cause on each of the alleged unfair labor practices. Contrary to respondents' arguments, the district court's findings are amply supported by both the record and pertinent case law.

The district court found the potential for irreparable injury in the absence of interim relief because of the potential effect of the large scale employee lockout on union

support and the union's ability to bargain effectively on behalf of its employees. The court specifically found that the lockout had already caused an erosion in union support. Erosion of union support cannot be remedied by the NLRB's ultimate order. *See Centro Médico*, 900 F.2d at 454; *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26–27 (1st Cir.1986). Moreover, we agree with the district court that the fact that the lockout in this case was directed to "the entire work force" increases the chances of irreparable harm. *See Maram*, 722 F.2d at 959. In this regard, the court specifically found that respondents' conduct had already caused many employees to be in arrears on their loans, which consequently damaged their credit. We find no abuse of discretion in the court's finding of a potential for irreparable harm.

Nor do we find abuse of discretion in the court's determination that the very real danger that the union would lose support because of unfair labor practices committed by the employer, combined with the actual financial harm to the employees, outweighs any harm which granting preliminary injunctive relief may cause the employer. *Cf. Centro Médico*, 900 F.2d at 454. Respondents argue that, if they are required to end the lockout and reinstate employees at their former wage and benefit levels, their "market share could well deteriorate further." Respondents stress that this would be particularly harmful if the NLRB later rules in their favor. The first answer to this argument is that we have already upheld the district court's determination that there is a strong likelihood that the NLRB will not rule in respondents' favor. This finding, of course, informs our balancing of the harms, and points in the direction opposite to that urged by respondents. Second, respondents' unsupported assertions regarding loss of market share amount to nothing more than bald speculation.

Finally, our resolution of the first three factors leads to the conclusion that the district court did not abuse its discretion in finding that the public interest will be furthered by imposition of the interim injunctive relief. Given the high number of employees effected by the lockout, *cf. Maram*, 722 F.2d

at 960, and the potential that interim relief will have the salutary effect of strengthening the bargaining process, *see Centro Médico,* 900 F.2d at 455, the public interest in preliminary relief appears strong. Contrary to respondents' assertions, we do not find that the length of time between the filing of charges by the union and the NLRB's application for interim was, under the circumstances, so unreasonable as to significantly undercut the public interest in preliminary relief.

### IV.

### *CONCLUSION*

Interim injunctive relief under § 10(j) is appropriate to restore the status quo "when the circumstances of a case create *a reasonable apprehension* that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless." *Centro Médico,* 900 F.2d at 455 (quoting *Angle v. Sacks,* 382 F.2d 655, 660 (10th Cir.1967)). The district court did not clearly err in finding reasonable cause to support the Regional Director's position that respondents' committed unfair labor practices. Nor did the district court abuse its discretion in concluding that interim injunctive relief was just and proper. The order of the district court is therefore *affirmed.* Costs to appellee.