USCA1 Opinion

 

 United States Court of Appeals For the First Circuit
No. 98-1993 VISITING NURSE SERVICES OF WESTERN MASSACHUSETTS, INC., Petitioner, Cross-Respondent, v. NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner, and LOCAL 285, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, CLC, Intervenor. PETITION FOR REVIEW OF A DECISION AND ORDER BY THE NATIONAL LABOR RELATIONS BOARD Before Torruella, Chief Judge, Stahl, Lynch, Circuit Judges. Albert R. Mason for petitioner, cross-respondent. Julie B. Broido, with whom Margaret A. Gaines was on brief,
for respondent, cross-petitioner.
May 24, 1999 LYNCH, Circuit Judge. This petition by the Visiting
Nurse Services of Western Massachusetts, Inc. ("VNS") seeks review
of an order by the National Labor Relations Board dated July 20,
1998. The NLRB has filed a cross-petition for enforcement of its
order. Local 285 of the Service Employees International Union
("the Union"), was permitted to intervene on the side of the Board. Of most significance here is VNS's attempt to read the National
Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. 158 (1994),
as permitting an employer who has not reached general impasse on
the package of collective-bargaining issues to nonetheless take
unilateral action on particular issues after declaring there was
impasse on those specific issues. The Board has rejected that
argument, as do we. I VNS is a corporation based in Holyoke, Massachusetts,
which provides home-based nursing home services. The last
collective bargaining agreement between VNS and the Union expired
on October 31, 1992; between July 1995 and March 1997, the parties
attempted to negotiate a successor agreement. We recite the facts
as taken from the stipulated facts before the Board. See Visiting
Nurse Servs. of W. Mass., Inc., 324 N.L.R.B. No. 212, 59 L.R.R.M.
(BNA) 1298, 1998 WL 414982, at *15 n.2 (July 20, 1998) (hereinafter
"Visiting Nurse Servs."). The parties met to negotiate on November 2, 1995. VNS
then presented a written proposal which stated, in pertinent part,
that: All proposals are and will be set forth based on a package bargaining basis. This means that if any portion of the package is unacceptable then the whole package is subject to revision. In this respect . . . if there are tentative agreements in a package but the whole package is not accepted then the tentative agreements are also subject to revision, deletion, addition, change etc. . . . [A]ll agreements will be subject to an acceptable total "final package" agreement . . . .
(Emphasis in original.) VNS's package proposal provided for a two-
percent wage increase and for a change from a weekly to a bi-weekly
payroll system, to become effective on November 6, 1995. The Union
did not accept the proposal but expressed a willingness to bargain
about various proposed alterations to the job classifications for
employee nurses. VNS presented a "substantially identical"
proposal on December 6, 1995, but this proposal also granted VNS
"the sole and unqualified right to designate [job] classifications
as it deemed necessary based on operational needs." Visiting Nurse
Servs., 1998 WL 414982, at *4. On February 29, 1996, VNS again offered the Union a two-
percent wage increase, effective retroactively to November 6, 1995,
in return for the Union's agreement to its proposals for a bi-
weekly payroll system and the job classification changes. The
Union, acknowledging the broad opposition (within its membership)
to the bi-weekly payroll system, rejected the proposal. See id. Nevertheless, on March 21, 1996, VNS notified the Union that "based
on operational and economic realities [VNS] intend[ed] to implement
'both' the wage increase and the bi-weekly pay proposals that, to
date, [VNS and the Union had] been unable to agree on." Five days
later, the Union replied: "We oppose the unilateral implementation
of the bi-weekly payroll system. . . . You have decided to tie
your proposed two percent increase in employee wages to the
implementation of a bi-weekly payroll system and we have rejected
that combined proposal." VNS implemented the wage increase on
April 7, 1996, and the bi-weekly payroll system on May 3, 1996. On June 18, 1996, VNS presented another "package
proposal." This proposal retained the earlier proposed job
classification changes and included a second two-percent wage
increase (to become effective July 7, 1996). The proposal also
added three new provisions: 1) the transformation of three holidays
into "floating" holidays to be taken at a time requested by the
employee; 2) the implementation of a "clinical ladders" program;
and 3) the adoption of an enterostomal therapist classification and
program. On the same day, VNS also proposed a smaller,
alternative package (the "mini package") which also included a
second two-percent wage increase along with the above proposals on
floating holidays and the clinical ladders and enterostomal
therapist and classification programs. The parties did not reach agreement on either proposal. In a letter dated August 20, 1996, VNS advised the Union that as of
September 6, 1996, it was contemplating implementing the "mini
package" and that "all of the above items [were] the 'positives'
that [the parties] discussed that could be implemented while
bargaining for a successor agreement continued." The Union
responded on September 5, 1996: "We oppose the unilateral
implementation of these proposals. The Union request[s] that you
not make any changes to wages, hours or working conditions. Please
do not hesitate to call me to arrange a meeting as soon as possible
to discuss this and other outstanding issues." (Emphasis in
original.) VNS then sent a memorandum, dated September 13, 1996, to
the bargaining unit employees (but not to the Union) informing them
that it had implemented the mini package with the wage increase to
be applied retroactively to July 7, 1996. Ten days later, VNS
advised the Union that the wage increase had already been
implemented and that the other programs (floating holidays,
clinical ladders, and enterostomal therapist and classification)
were "already in process." After emphasizing its view that these
were "only 'positive items'" meant to enhance the staff's economic
conditions while bargaining continued, VNS declared that "it [was]
the Agency's position that the mini package involved ha[d] been
properly implemented." The Union filed a charge with the NLRB on September 30,
1996; it amended that charge on November 12, 1996. Based on these
charges, the General Counsel of the NLRB issued a complaint against
VNS on December 31, 1996, and amended that complaint on April 24,
1997. II The NLRB order found that VNS violated 8(a)(1) and (5)
of the Act by unilaterally implementing 1) a bi-weekly payroll
system on or about May 3, 1996; 2) changes in holidays on or about
September 6, 1996; 3) a clinical ladder program on or about
September 6, 1996; 4) an enterostomal therapist classification and
program on or about September 6, 1996; and 5) changes in job
classifications at some time subsequent to May 3, 1996. VNS made
these changes while it was still bargaining with the Union and had
not yet reached general impasse. See Visiting Nurse Servs., 1998
WL 414982, at *11. There is no dispute that all of these are
mandatory subjects of bargaining under 8(d) of the Act. Before the NLRB, the parties stipulated that they had not
reached impasse in their bargaining on the agreement as a whole. Thus, under controlling law, because impasse had not been reached,
the employer could take unilateral action on a mandatory subject of
bargaining only under a narrow range of circumstances. See
N.L.R.B. v. Katz, 369 U.S. 736, 741-43 (1962). No economic
exigencies or business emergencies existed here which would warrant
unilateral action. See Visiting Nurse Servs., 1998 WL 414982, at
*9; see also N.L.R.B. v. Triple A Fire Protection, Inc., 136 F.3d
727, 739 (11th Cir. 1998), cert. denied, 119 S. Ct. 795 (1999)
(noting that "[a] situation of economic necessity requires either
a showing of extenuating circumstances or a compelling business
justification" (internal quotation marks omitted)). The NLRB found
that the usual rule applied and there were no exceptions. See
Visiting Nurse Servs., 1998 WL 414982, at *9-10. The NLRB issued
a broad remedial order based on a finding that VNS has a proclivity
to violate the Act. See id. at *13-14. One member dissented,
finding the stipulated record insufficient, and would have remanded
the matter to an administrative law judge for a full hearing. See
id. at *16. III We review the Board's conclusions of law de novo, see N.L.R.B. v. Beverly Enterprises-Massachusetts, Inc., 1999 WL
179667, at *3 (1st Cir. Apr. 6, 1999) (citing the Administrative
Procedure Act, 5 U.S.C. 706), and take the Board's findings of
fact to be "conclusive if supported by substantial evidence on the
record considered as a whole." Id. (citing 29 U.S.C. 160(e)). VNS makes four arguments. First, it argues that the rule
adopted by the Fifth Circuit in N.L.R.B. v. Pinkston-Hollar
Construction Services, Inc., 954 F.2d 306 (5th Cir. 1992), should
be adopted here and that this rule would excuse VNS's unilateral
actions. Second, VNS says the NLRB's determination that VNS in
fact implemented the clinical ladders program and enterostomal
therapist classification and program is not supported by
substantial evidence. Accordingly, the issue was not ripe and
should not have been the subject of an order. Third, VNS says it was error for the Board to accept as
an amendment to the complaint any claims about the earlier
implementation of the bi-weekly payroll. VNS says this is barred
by the applicable limitations period in 10(b) of the Act. The
original unfair labor practice charge was filed by the Union on
September 30, 1996, and included all the items at issue in this
case save for the May 1996 installation of a bi-weekly payroll
system. That charge was timely as to the claims alleged. The
General Counsel issued a complaint pursuant to it. On November 12,
1996, that complaint was amended to include the bi-weekly payroll
system implemented as of May 3, 1996. The NLRB's finding that the
amended complaint claims were "closely related" to those in the
original complaint is attacked. Fourth, VNS argues that the Board's order is
unenforceable because it required the employer to return only to a
partial status quo ante, not the complete status quo ante. Under
the Board's remedial order, the Union members' two two-percent wage
increases are untouched, but the employer is required to rescind
(at the Union's request) the other parts of its bargaining package
which it wants and which it unilaterally implemented. VNS says
this one-sidedness is particularly unfair since it needed the other
items in the bargaining package in order to fund the pay raises. Such an order is punitive, says VNS, and the NLRB can only make
remedial orders.
A. Obligation To Bargain When No General Impasse Exists Relying on the Fifth Circuit's decision in Pinkston-
Hollar, VNS argues that once it had given the Union notice of its
position on a particular issue and an opportunity to respond, it
was free to unilaterally declare impasse on specific issues and to
take action. In response to the employer's contention, the Board held: [A]s a general rule, when, as here, parties are engaged in negotiations for a collective-bargaining agreement, an employer's obligation to refrain from unilateral changes extends beyond the mere duty to provide a union with notice and an opportunity to bargain about a particular subject matter before implementing such changes. Rather, an employer's obligation under such circumstances encompasses a duty to refrain from implementing such changes at all, absent overall impasse on bargaining for the agreement as a whole. There are two limited exceptions to that general rule: (1) when a union, in response to an employer's diligent and earnest efforts to engage in bargaining, insists on continually avoiding or delaying bargaining, or (2) when economic exigencies or business emergencies compel prompt action.
Visiting Nurse Servs., 1998 WL 414982, at *9 (internal footnotes
omitted). The Board found that neither exception applied. Both the Supreme Court and this court have affirmed the
rule that unless the employer has bargained to impasse on the
agreement as a whole, there is a violation of 8(a)(1) and (5) if
the employer makes unilateral changes in mandatory subjects of
bargaining (subject to the very limited exceptions described
above). See Litton Fin. Printing Div. v. N.L.R.B., 501 U.S. 190,
198 (1991) (citing N.L.R.B. v. Katz, 369 U.S. 736 (1962)); Rivera-
Vega v. ConAgra, Inc., 70 F.3d 153, 162 (1st Cir. 1995) (citing
Katz, 369 U.S. at 743). The doctrine applies where an existing
contract has expired and the negotiations for a new one are not
concluded. See Litton, 501 U.S. at 198. This court has long said that an employer must bargain to
impasse before making a unilateral change. See N.L.R.B. v. U. S.
Sonics Corp., 312 F.2d 610, 615 (1st Cir. 1963). The basic
principles were established in 1962 by the Supreme Court's decision
in N.L.R.B. v. Katz, 369 U.S. 736 (1962). Analogizing to the
unlawful situation of a refusal to negotiate as to "any subject"
within 8(d) of the Act as to which the union seeks to negotiate,
the Court held that: an employer's unilateral change in conditions of employment under negotiation is similarly a violation of 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of 8(a)(5) much as does a flat refusal.
Id. at 743. Katz also rejected the argument that subjective bad
faith is required to find a 8(a)(5) violation. See id. at 747. Katz involved a newly certified union and the failure to reach an
initial agreement. See id. at 739-40. The Supreme Court has applied the Katz rule to
situations, as here, where an existing agreement has expired but
negotiations on a new one had not been completed. See Laborers
Health and Welfare Trust Fund for N. Cal. v. Advanced Lightweight
Concrete Co., 484 U.S. 539, 544 n.6 (1988). Further, in Litton the
Court reaffirmed that "an employer commits an unfair labor practice
if, without bargaining to impasse, it effects a unilateral change
of an existing term or condition of employment." Litton, 501 U.S.
at 198; see also Beverly Enterprises, 1999 WL 179667, at *7, *11
(describing the Katz rule); Rivera-Vega, 70 F.3d at 162 (applying
the Katz rule). We reject VNS's position that parties are at impasse
merely because the Union rejects or does not accept the employer's
position on a particular issue. "[M]ere rejection of a bargaining
proposal does not create an impasse." N.L.R.B. v. Central Plumbing
Co., 492 F.2d 1252, 1254 (6th Cir. 1974). Whether there is an
impasse is an intensely fact-driven question, with the initial
determination to be made by the Board. Our role is to review the
Board's factual determinations to determine whether there is
substantial evidence in the record as a whole to support the
Board's finding on impasse. There may be instances where one or
two issues so dominate and drive the collective bargaining
negotiations that the Board would be justified in finding that
impasse on those one or two issues amounts to a bargaining
deadlock. Cf. American Federation of Television and Radio Artists,
Kansas City Local v. N.L.R.B., 395 F.2d 622, 628 n.13 (D.C. Cir.
1968) (noting that "a deadlock on one critical issue can create as
impassable a situation as an inability to agree on several or all
issues"). But that is a far cry from this case. As this court has
said, "[i]mpasse occurs when, after good faith bargaining, the
parties are deadlocked so that any further bargaining would be
futile." Bolton-Emerson, Inc. v. N.L.R.B., 899 F.2d 104, 108 (1st
Cir. 1990). The Supreme Court has commented on the difficulty of
applying the concept of "impasse" to a given set of facts, noting:
"perhaps all that can be said with confidence is that an impasse is
a state of facts in which the parties, despite the best of faith,
are simply deadlocked." Laborers Health, 484 U.S. at 543 n.5
(quoting R. Gorman, Basic Text on Labor Law, Unionization and
Collective Bargaining 448 (1976)) (internal quotation marks
omitted). The NLRB has similarly interpreted the scope of the
statutory duty to bargain. Congress delegated to the Board, in 8(d) of the Act, the responsibility to make that interpretation. See Ford Motor Co. v. N.L.R.B., 441 U.S. 488, 496 (1979). The
Board's interpretation is rational and consistent with the Act. See Litton, 501 U.S. at 200 ("[I]f the Board adopts a rule that is
rational and consistent with the Act . . . then the rule is
entitled to deference from the courts." (quoting Fall River Dyeing
& Finishing Corp. v. N.L.R.B., 482 U.S. 27, 42 (1987) (internal
quotation marks omitted)). Collective bargaining involves give and take on a number
of issues. The effect of VNS's position would be to permit the
employer to remove, one by one, issues from the table and impair
the ability to reach an overall agreement through compromise on
particular items. In addition, it would undercut the role of the
Union as the collective bargaining representative, effectively
communicating that the Union lacked the power to keep issues at the
table. In rejecting another employer's argument that it could
unilaterally change a term or condition of employment as soon as
the union was notified of the intended change and given an
opportunity to bargain, the NLRB stated: By utilizing this approach with respect to various employment conditions seriatim, an employer eventually would be able to implement any and all changes it desired regardless of the state of negotiations between the bargaining representative of its employees and itself. . . . [U]nder this approach, form, rather than substance, becomes the determinative factor in deciding whether the bargaining obligation has been fulfilled. In consequence, meaningful collective bargaining is precluded and the role of the bargaining representative is effectively vitiated.
Winn-Dixie Stores, Inc., 243 N.L.R.B. No. 151, 101 L.R.R.M. (BNA)
1534, 1979 WL 9346, at *4 (Aug. 2, 1979). The Board's approach is
both rational and consistent with the NLRA and so is entitled to
deference. See Litton, 501 U.S. at 199. The Pinkston-Hollar case does not assist VNS. First, it
is inconsistent with the approach taken by this Circuit. See
Rivera-Vega, 70 F.3d at 162; N.L.R.B. v. U.S. Sonics Corp., 312
F.2d 610, 615 (1st Cir. 1963). Second, the case is best understood
as one where the court found that the union failed to bargain and
to act with due diligence after being given the employer's
proposal. See N.L.R.B. v. Triple A Fire Protection, 136 F.3d 727,
738-39 (11th Cir. 1998), cert. denied, 119 S. Ct. 795 (1999). But
VNS does not argue here that the Union avoided or delayed
bargaining and so Pinkston-Hollar is, even on its own terms,
inapplicable.
B. Ripeness VNS argues that it never actually finalized or
implemented the clinical ladder program or the creation of an
enterostomal therapist classification and program, and so these
matters were not ripe for Board action. VNS says that the Board's
contrary determination was not supported by substantial evidence. This court has explained that "[s]ubstantial evidence is such
relevant evidence as a reasonable mind might accept as adequate to
support a conclusion. The reviewing court must consider the record
in its entirety . . . ." Beverly Enterprises, 1999 WL 179667, at
*3 (internal quotation marks and citations omitted). To find that VNS had in fact implemented these programs,
the Board relies on a September 13, 1996, memorandum from VNS. That memorandum, as VNS argues, only establishes that the wage
increase was being adopted. But on September 23, 1996, VNS sent
out a letter (on which the Board also relies) saying that the
remaining changes were "already in process." The Board also found
that a registered nurse (who was a unit employee) was selected for
the enterostomal therapy program and actually trained. The Board
also says that the job classification program was implemented
before June 13, 1997. VNS argues that because the September 23 letter
explicitly concedes that the wage increase had already been adopted
(or "rolled in"), the language describing the remaining changes as
being merely "in process" must mean that those changes had not yet
been "finalized." The phrase "in process" (or "into process")
appears twice in the September 23 letter: As we [VNS] had pointed out in our notice to the Union, implementation was contemplated for 9/6/96. The items involved are items that had to be put into process for implementation on the 6th. Accordingly, by the time you contacted us we had already prepared the payroll with the increase rolled in. In addition, the other programs are also items that we had to prepare for in advance and they too are already in process.
(Emphasis added.) VNS's interpretation of this language sees a
material difference between the implementation of the wage increase
(which VNS concedes) and the implementation of the other changes
(which VNS disputes). We reject such a strained reading. To begin, VNS's interpretation misses the relevant legal
question: the issue here is whether, in the absence of a general
impasse, VNS unilaterally adopted or implemented the programs still
under negotiation, not whether VNS had already fully executed the
programs. Cf. Winn-Dixie, Inc., 1979 WL 9346, at *4 (stating that
an employer may not unilaterally "implement" changes absent an
impasse). A sentence from the last paragraph of the letter speaks
directly to this question by stating "the Agency's [VNS's] position
that the mini package involved ha[d] been properly implemented"
(emphasis added). This indicates that VNS had already made the
decision had already taken unilateral action to implement the
proposed programs that were still under negotiation. That these changes were merely "in process" on September
23, 1996, does not alter our conclusion. Contrary to VNS's
interpretation, the letter indicates that the entire mini package
had already been adopted and the only remaining question was when
the other programs would actually "roll in." The facts surrounding
the implementation of the enterostomal therapist program bolster
our view. On October 7, 1996, merely two weeks after sending the
September 23 letter, VNS paid for a unit employee nurse to begin
her training in the enterostomal therapist program, one of the
other programs included in the mini package. It is, in fact, unlikely that any program could be "in
process" without VNS first adopting the new program and setting in
motion the gears that would eventually effectuate that program. The Board concluded that that is what happened in this case, and we
see ample and substantial evidence to support its finding. Accord
Beverly Enterprises, 1999 WL 179667, at *3 (noting that "the
possibility of drawing two inconsistent conclusions from the
evidence does not prevent an administrative agency's finding from
being supported by substantial evidence" (internal quotation marks
omitted)).
C. Timeliness The amendment to the complaint to cover the May 1996
implementation of a bi-weekly payroll system is not time-barred. Section 10(b) of the Act provides both that a charge must be filed
within six (6) months of the unfair labor practice in order for a
complaint to issue and that the Board may, in its discretion,
provide for amendment of the complaint at any time before the order
issues. See 29 U.S.C. 160(b). Indeed, this six-month rule does
not apply to the issuance of an amendment to a complaint, but only
to the filing of a charge. See Truck Drivers & Helpers Union,
Local No. 170 v. N.L.R.B., 993 F.2d 990, 1000 n.12 (1st Cir. 1993). There is no dispute that the initial charges were timely. The NLRB permits amendment when the new charges are
closely related to the original timely charges. Courts liberally
interpret the NLRB's power to amend a complaint. See Eastern Maine
Medical Center v. N.L.R.B., 658 F.2d 1, 6 (1st Cir. 1981) (noting
that 10(b)'s grant of discretion to amend a complaint "has been
interpreted liberally to allow the relation back of amendments
alleging acts that are part of the same general course of conduct
as the acts alleged in the charge and within the same time frame"
(footnote omitted)). "A complaint based on a timely filed charge
may be amended to include other allegations if they are 'closely
related' to the underlying timely charge and occurred within six
months of the charge." Truck Drivers, 993 F.2d at 1000 n.12. The
test for determining whether alleged unfair labor practices are
"closely related" is this: First, the Board will look at whether otherwise untimely allegations involve the same legal theory as the allegations in the pending timely charge. Second, the Board will look at whether the otherwise untimely allegations arise from the same factual circumstances or sequence of events as the pending timely charge. Finally, the Board will look at whether a respondent would raise similar defenses to both allegations. Id. at 1000. The Board was correct to find that the unilateral change
in the payroll system was closely related to the timely charges
about the unilateral changes in wages and hours. First, the bi-
weekly payroll system allegations are based on the same legal
theory as the remaining allegations namely, that VNS sought to
circumvent the collective-bargaining process by making unilateral
changes. See N.L.R.B. v. Fant Milling Co., 360 U.S. 301, 307
(1959) (noting that allegations that involve "the same class of
violations as those set up in the charge" may be included in the
complaint). In fact, the allegations are based on the same section
of the Act, 8(a)(5), a fact that reflects closer legal proximity
than the law requires. See Truck Drivers, 993 F.2d at 1001 ("With
respect to the similarity between the legal theories underlying
each charge, it is clear that the allegations need not be under the
same statutory section. It is sufficient that both charges are
part of the same effort or crusade against the union." (internal
citations omitted)). Second, the payroll system allegations arose from the
same factual circumstances and sequence of events: the proposed
payroll system was introduced within the same series of package
proposals that included the other unilateral changes, and all of
these changes occurred during the same period (from May to
September 1996) during which the parties were negotiating. See
Truck Drivers, 993 F.2d at 1001 ("Charges will be found closely
related factually if they arise from the same sequence of events."
(internal quotation marks omitted)). Finally, the Board properly found that VNS would raise
similar defenses to both sets of charges charges based on the
same statutory provision and fueled by the same legal theory. See N.L.R.B. v. Overnite Transp. Co., 938 F.2d 815, 820 (7th Cir. 1991)
(noting that a court should examine "whether a reasonable
respondent would have preserved similar evidence and prepared a
similar case in defending against the allegations in the timely
pending charge").
D. Remedy VNS complains that the Board's rescission order in this
case is beyond the Board's jurisdiction, is punitive, and
improperly compels VNS to make concessions. To support this
argument, VNS explains that the Board's order that VNS rescind the
unlawful changes (at the Union's request) and return to the "status
quo" would leave the two two-percent wage increases in place,
thereby punishing VNS and forcing it to make concessions. The Board has "the primary responsibility and broad
discretion to devise remedies that effectuate the policies of the
Act," and that discretion is "subject only to limited judicial
review." Sure-Tan, Inc. v. N.L.R.B., 467 U.S. 883, 888-89 (1984);
see also Pegasus Broadcasting of San Juan, Inc. v. N.L.R.B., 82
F.3d 511, 513 (1st Cir. 1996). "A Board-ordered remedy 'should
stand unless it can be shown that [it] is a patent attempt to
achieve ends other than those which can fairly be said to
effectuate the policies of the Act.'" Pegasus, 82 F.3d at 513
(quoting Virginia Elec. & Power Co. v. N.L.R.B., 319 U.S. 533, 540
(1943)). The Board justifies its order by saying there was never
an unfair labor practice charge filed about the wage increases and
so there is no occasion to take action on them. It is no surprise
that the Union did not complain about the wage increases. While
unilateral wage increases given by the employer in the face of a
union organizing or recognition campaign have been the subject of
unfair labor practice charges, see, e.g., N.L.R.B. v. Wis-Pak
Foods, Inc., 125 F.3d 518, 525-26 (7th Cir. 1997) (upholding the
NLRB's determination that the post-election grant of a wage
increase was motivated by a desire to erode union support and was
therefore an unfair labor practice), that is not the context here. The employer here played a risky hand in its tactics, a
hand contrary to the prevailing law. In the quid pro quo of
collective bargaining, that employees may keep the quid of wage
increases while the employer may not keep the quo of the rest of
the package is the consequence of the employer's decision to
unilaterally remove these subjects from bargaining and implement
them without union agreement. There is nothing punitive about the
Board's decision not to act on the wage increases in the absence of
an unfair labor practice charge. For the foregoing reasons we dismiss VNS's petition and
we grant the cross-petition of the NLRB to enforce the Board's
order.