**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**U. S. SONICS CORPORATION, Respondent.**

**No. 6000.**

United States Court of Appeals
First Circuit.

Jan. 31, 1963.

Washington, D. C., were on brief, for petitioner.

Jerome Medalie, Boston, Mass., with whom Michael H. Goshko and Cohn, Riemer & Pollack, Boston, Mass., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of its order issued February 5, 1962 against the respondent, U. S. Sonics Corporation.

In adopting the opinion of its trial examiner, the Board found that respondent—a Massachusetts corporation engaged in the production of electronic ceramic components and related products—had violated Section 8(a) (5) and (1) of the Act by withdrawing recognition from the Union [1] as the employees' bargaining representatives during the certification year, and by engaging in certain unilateral actions with its employees, assertedly calculated to undermine the Union in its role of bargaining agent. The Board also found a violation of Section 8(a) (3) and (1) on the ground that seven of respondent's employees were discharged because of union activity. Finally, the Board found that respondent violated Section 8(a) (1) by interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7.

On August 19, 1960 the Union was certified as the exclusive bargaining representative in an appropriate unit following a Board-conducted election held pursuant to a consent election agreement. Thereafter negotiations for a contract commenced and continued until March 3, 1961.

Ira M. Lechner, Atty., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty.,

At the close of the negotiating session of March 3 both the respondent and the Union believed that an agreement had been reached on all points of a prospective collective bargaining agreement.

1. International Union of Electrical, Radio and Machine Workers, AFL–CIO.

Accordingly, one of the principals during the course of the negotiating sessions —Joseph Duggan, chief union negotiator—was selected to reduce the agreement to writing. However, what actually was agreed upon on the wage issue and each party's understanding of that phase of the agreement forms a central issue in this case.

The Union subsequently contended that under the oral agreement of March 3—all of respondent's workers were to receive a ten cent an hour raise upon the completion of a stipulated probationary period. On the other hand, the respondent claims that it was the understanding of the parties that the only workers entitled to the wage increase upon the completion of the probationary period were those who had been hired at the respondent's minimum wage rate.

Duggan prepared a written contract—reflecting the Union's alleged understanding of the wage issue—and submitted it to respondent for signature on March 20, 1961. Respondent, reflecting its own understanding of the oral agreement of March 3, changed the wording of the wage clause and returned the contract to the Union unsigned on April 7. On that same day, a certain John Connor, the Union's chief steward at the plant, contacted one of respondent's officials concerning the company's position on the wage issue. Upon learning of the respondent's position, Connor transmitted this information to the Union membership which immediately voted to strike. The strike began on the afternoon of April 7. It was not authorized by Duggan who, at that point, was unaware that strike action had been taken. However, on the evening of April 7, Duggan and Connor met with management officials in an attempt to settle the dispute. At this meeting the Union raised issues not discussed previously in negotiations and respondent made concessions on some ancillary aspects of the agreement. This meeting was terminated without substantial agreement on the question of wages. The parties agreed to meet again on April 10 and the strike continued.

On April 8 respondent's president, Eric Kolm, sent all employees a letter inviting them to hear management's "story" at a meeting scheduled for the following Monday afternoon, April 10. This was the first step in the course of unilateral action which the Board found was calculated to undermine the Union. At this meeting respondent offered financial inducements to the employees if they would return to work. Subsequent to the meeting of April 10, respondent's officials again met with Union representatives at the company's office. No agreement was reached and the strike continued. On April 12 respondent and the Union again failed to reach an agreement after meeting with a state conciliator. That same day, in a letter sent to each employee, respondent repeated the offer which Kolm had made directly to the employees on April 10, summarized various offers which had previously been made to the Union, and outlined an alternative wage proposal. Respondent expressed its willingness to sign a contract "immediately" on the basis of any of the proposals outlined in the letter.

On April 15 respondent sent letters to all strikers advising them unless they reported for work by Wednesday, April 19, " * * * the Company intends to hire a permanent replacement for your job."

At a Union meeting on April 18 the strikers voted to return to work and to accept one of the offers proposed by respondents in its April 12 letter. Duggan immediately notified respondent by telegram stating that "all employees shall report for work April 19, 1961 in accordance with your letter of April 15, 1961."

On April 19 respondent sent a telegram notifying Duggan that the respondent had concluded that the Union no longer represented a majority of its employees and stating that the company "had decided to withdraw recognition from it and terminate all bargaining negotiations." The telegram enumerated a number of reasons which were the asserted basis for the company's conclusion that the Union had lost its majority.

Since April 19 the respondent has refused to recognize the Union or meet with its representatives.

The strikers returned to work on April 19. Respondent's president welcomed them back and announced, in effect, that the company would conduct an election to determine whether the employees wanted an "inside" or an "outside" union to represent them, pledging to bargain with the choice of the majority. There was evidence to indicate that on April 20 Kolm announced that if the employees chose an "inside" union they either would not have to pay dues, or if dues were assessed the money would be placed in a Christmas fund for their use.

On the following day, shortly before the employees were scheduled to vote, one of respondent's supervisors distributed a document entitled "Agreement As To Conditions Of Employment." This agreement purported to set out in detail respondent's obligations concerning wages and working conditions. The employees thereupon did not vote that day, preferring, in the words of one witness, to defer a vote until there was "time to read the contract."

On April 24 and 25 respondent discharged a group of employees, many of whom were active union adherents and seven of whom are involved in the present proceeding.[2]

On the following day, April 26, an election was conducted on company premises during working hours. The workers had a choice to vote for the certified Union, a "company" union, or remain "undecided." It appears that the first or "day" shift cast a majority of ballots for the certified Union. The record is silent as to whether the workers on the night shift voted. The employees who' were discharged the previous day were prevented from voting by respondent's supervisors on the ground that they were no longer employees.

In determining the propriety of the Board's predication of violations of the Act on the foregoing facts, we are met at the outset by respondent's challenge to a ruling of the trial examiner excluding testimony ostensibly aimed at illuminating the true purport of the original oral agreement made by the respondent and the Union on March 3, 1961.

The trial examiner wrote his decision on the basis that the dispute over the wage issue stemmed from a mutual misunderstanding of what had actually been agreed upon at the March 3 meeting. He imputed bad faith bargaining to neither party from the disagreement which arose as to the intendment of the oral agreement, although the General Counsel had originally sought to charge such conduct against the respondent. Consequently, in his view, the strike which commenced on the afternoon of April 7 was economic in nature and the strikers were thereby engaging in "protected" activity within the meaning of the Act. Thereafter, in the trial examiner's view, once the respondent initiated its course of unilateral activities—by-passing the duly certified union—the strike which was originally economic in nature was converted into an unfair labor practice strike, and the strikers were "unfair labor practice strikers."

It is respondent's contention that the disagreement which arose from the March 3 meeting was not a *bona fide* one and that the Union, in effect, deliberately reneged on the terms of the original agreement (assertedly under the pressure of the Union membership). Respondent urges that the Union deliberately altered its position following the oral agreement and retreated from the terms previously agreed upon during the March 3 meeting. By this action, according to respondent, the Union failed to bargain in good faith. Since this activity occurred before the strike, respondent argues that the strike was unprotected and

2. The complaint originally listed eighteen employees as unlawfully discharged. Only seven appeared at the hearing and General Counsel's motion to strike the names of the others from the complaint was granted.

the unilateral activities in which respondent indulged during the strike must accordingly be viewed in a changed context.

Section 8(b) (3) of the Act makes union refusal to bargain collectively in good faith an unfair labor practice. (29 U.S.C. § 158(b) (3)). Consequently, if the company could establish its position, then the strike of April 7 might be deemed to be beyond the protection of the statutory guarantee of the right to engage in "concerted activities for the * * * mutual aid or protection" of employees, 29 U.S.C. § 157, since activities which violate stated provisions of the Act itself are unprotected. See, e. g., Hoover Co. v. National Labor Relations Board, 191 F.2d 380 (6th Cir. 1951); cf., Thompson Products, Inc., 72 N.L. R.B. 886 (1947).

In the attempt to show that the Union had deliberately retrenched from its previous agreement on wages, the respondent called as a witness one Robert Gaudette. Gaudette, who was the chief union steward at the time of the March 3 meeting, was present at that meeting as well as previous bargaining sessions between the parties. He testified that following the March 3 meeting it was his understanding that the parties had reached a firm agreement on the subsequently disputed wage issue and that the agreement was in accord with the position for which the company contended and "Definitely not" consonant with the Union's position. Respondent then attempted to show that on the day following the strike, Gaudette sought Duggan and queried him as to why the Union was now taking a position inconsistent with that which had previously been agreed upon. At this point the trial examiner foreclosed any inquiry into the conversation which then ensued between Gaudette and Duggan.

However, counsel for respondent made an offer of proof as to what Gaudette would testify. The thrust of the offer was that Gaudette, after expressing surprise at the Union's apparent change of position, asked for Duggan's own copy of the draft which had been drawn up at the March 3 meeting and thereupon pointed out that Duggan's copy itself reflected an understanding on the wage issue consonant with the company's position and contrary to that of the Union's. Thereupon—the offer of proof continued —in answer to Gaudette's question as to why the Union was now making an issue of the point, Duggan responded *inter alia* "that the question hadn't been reduced to writing."

We believe that it was clearly error for the trial examiner to exclude evidence bearing directly on the question of the good faith of the Union and which went centrally to the issue of whether or not a *bona fide* misunderstanding actually existed between the parties. Permitting Gaudette to testify on this point would surely have enabled the trial examiner and the Board to make a more knowledgeable decision on the true purport of the March 3 meeting. Its exclusion is particularly surprising in view of the trial examiner's statement in his opinion that "the state of the record does not permit the Trial Examiner to determine precisely what the parties had agreed to on March 3." The excluded testimony went directly to that issue and should have been admitted. Consequently, assuming that the repudiation of agreements previously reached by duly authorized representatives constitutes a failure to bargain in good faith, see, National Labor Relations Board v. Shannon, 208 F.2d 545 (9th Cir. 1953); National Labor Relations Board v. Gittlin Bag Co., 95 N.L.R.B. 1159 (1951), enforcement granted, 196 F.2d 158 (4th Cir. 1952), and that a party's state of mind on the question of good faith may be revealed by declarations or admissions, see, National Labor Relations Board v. Swift & Co., 127 F.2d 30 (6th Cir. 1942); Continental Oil Co. v. National Labor Relations Board, 113 F.2d 473 (10th Cir. 1940), we believe that the exclusion of the offered evidence was substantially prejudicial to respondent.

However, counsel for the Board argues alternately that the Board's findings may still be affirmed even assuming that the

strike was unprotected. We will, therefore, on the present state of the record, proceed on that basis.

The Board's initial finding of a violation of Section 8(a) (5) and (1)—a refusal to bargain—was predicated on the respondent's activities in dealing directly with the employees and offering them benefits—thus, bypassing the Union during the period beginning April 8, the day after the strike began, and continuing until the settlement of the dispute on April 18. By this course of conduct, according to the trial examiner—respondent sought to effectively undermine the Union.

■■ It is the general rule that an employer cannot negotiate wages or other terms of employment with individual workers, once a duly authorized bargaining representative has been selected. Such unilateral activities are antithetical to the basic philosophy of the Act which is the encouragement of collective—as opposed to individual—bargaining. Nat'l Labor Relations Board v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); May Stores Co. v. Nat'l Labor Relations Board, 326 U.S. 376, 385, 66 S.Ct. 203, 90 L.Ed. 145 (1945); Medo Corp. v. Nat'l Labor Relations Board, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); cf. J. I. Case Co. v. Nat'l Labor Relations Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944).

■ However, where the parties have engaged in *bona fide* negotiations but an impasse is reached, the employer may effect unilateral changes or make unilateral offers to the extent of his best offer to the union. See, Nat'l Labor Relations Board v. Crompton Mills, 337 U.S. 217, 225, 69 S.Ct. 960, 93 L.Ed. 1320 (1949); National Labor Relations Board v. Andrew Jergens Co., 175 F.2d 130 (9th Cir. 1949), cert. denied, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503. So long as no greater inducement is offered to the workers than was offered to the Union and there is notice to and consultation with the Union, then unilateral activity is not proscribed.

■ We believe that on April 8, the day on which the company commenced its course of assertedly illicit unilateral overtures, it would have been justified in believing that an impasse had been reached. Consequently, under the above cited principles, respondent's acts in meeting directly with its employees and making wage offers to them were not violative of the Act so long as its offers did not exceed the bounds of benefits previously offered to the Union.

Upon a careful examination of the record we are unable to conclude that substantial evidence on the record considered as a whole supports the Board's finding that the offers made to the workers exceeded those previously made to the Union or that the respondent's proposals to the workers contradicted its previous position taken with the Union Consequently, to the extent that these activities are relied upon by the Board to establish a refusal to bargain, the order will be denied enforcement.

■ Our determination on this branch of the case affects the Board's finding on the question of whether the discharge of the seven workers was for union activity. The company argues that these discharges were actuated by economic considerations and not anti-union animus. However, in resolving this issue, the trial examiner after pointing out alleged inconsistencies in the company's economic justification evidence, apparently laid heavy stress on the company's unilateral activities with the workers as affirmative evidence indicating an anti-union bias. Since, as we view the record, this factor must be reappraised, this portion of the order will also be denied enforcement.

We turn then to that aspect of the Board's findings and order which directly concern the activities of the respondent, following the Union's acceptance of one of respondent's offers on April 18, 1961. As noted previously, upon receipt of the acceptance, the company immediately notified the Union that it was withdrawing recognition on the basis that it no longer believed that the Union represented a

majority of employees within the appropriate bargaining unit. The respondent's asserted justification for this decision was the "radical and dramatic expansion" which had occurred within the unit during the certification year.

 We believe that the attempt to withdraw recognition from the Union during the course of the certification year was wrong. It is now settled that an employer must bargain with the certified representative for a period of one year from the date of the Board's certification, even if the union loses its majority status through no fault of the employer. Brooks v. Nat'l Labor Relations Board, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); National Labor Relations Board v. Henry Heide, Inc., 219 F.2d 46 (2nd Cir. 1955), cert. den., 349 U.S. 952, 75 S.Ct. 884, 99 L.Ed. 1277. The philosophy behind this rule is to foster stability in collective bargaining relations by requiring that the employer deal with the union until a new election is sanctioned, or until the Board indicates that the employer need no longer bargain with the previously certified union. As stated by the Supreme Court in Brooks v. Labor Board, supra, an employer who, during the certification year, doubts the union's majority status, has the "responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit. Although the Board may, if the facts warrant, revoke a certification or agree not to pursue a charge of an unfair labor practice, these are matters for the Board; they do not justify employer self-help or judicial intervention. The underlying purpose of this statute is industrial peace." 348 U.S. at 103, 75 S.Ct. at 181.

In the instant case the respondent sought to resort to the kind of "self-help" proscribed in Brooks, supra. Moreover, respondent not only neglected to petition the Board for relief while declining to recognize the Union but resorted to further self-help after the withdrawal of recognition by encouraging the employees to select an "inside" union in preference to the certified union.

We believe that to the extent that these activities are relied upon by the Board to sustain the violations of Section 8(a) (5) and (1) and Section 7 of the Act, the order should be enforced.

A decree will be entered enforcing the order of the Board to the extent that it requires recognition and good-faith bargaining with the Union, and vacating the balance of the order, and remanding the case to the Board for further proceedings not inconsistent with this opinion.