VISITING NURSE SERVICES OF WESTERN MASSACHUSETTS, INC., Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner,

and

Local 285, Service Employees International Union, AFL– CIO, CLC, Intervenor.

No. 98–1993.

United States Court of Appeals, First Circuit.

Heard May 3, 1999.

Decided May 24, 1999.

Albert R. Mason for petitioner, cross-respondent.

Julie B. Broido, with whom Margaret A. Gaines was on brief, for respondent, cross-petitioner.

Before TORRUELLA, Chief Judge, STAHL, LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

This petition by the Visiting Nurse Services of Western Massachusetts, Inc. ("VNS") seeks review of an order by the National Labor Relations Board dated July 20, 1998. The NLRB has filed a cross-petition for enforcement of its order. Local 285 of the Service Employees International Union ("the Union"), was permitted to intervene on the side of the Board. Of most significance here is VNS's attempt to read the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158 (1994), as permitting an employer who has not reached general impasse on the package of collective-bargaining issues to nonetheless take unilateral action on particular issues after declaring there was impasse on those specific issues. The Board has rejected that argument, as do we.

## I

VNS is a corporation based in Holyoke, Massachusetts, which provides home-based nursing home services. The last collective bargaining agreement between VNS and the Union expired on October 31, 1992; between July 1995 and March 1997, the parties attempted to negotiate a successor agreement.[1] We recite the facts as taken from the stipulated facts before the Board. See Visiting Nurse Servs. of W. Mass., Inc., 325 N.L.R.B. No. 212, 159 L.R.R.M. (BNA) 1298, 1998 WL 414982, at *15 n. 2 (July 20, 1998) (hereinafter "Visiting Nurse Servs.").

The parties met to negotiate on November 2, 1995. VNS then presented a written proposal which stated, in pertinent part, that:

All proposals are and will be set forth based on a package bargaining basis. This means that if any portion of the package is unacceptable then the whole package is subject to revision. In this respect . . . if there are tentative agreements in a package but the whole package is not accepted then the tentative agreements are also subject to revision, deletion, addition, change etc. . . . [A]ll agreements will be subject to an acceptable total "final package" agreement . . . .

(Emphasis in original.) VNS's package proposal provided for a two-percent wage increase and for a change from a weekly to a bi-weekly payroll system, to become effective on November 6, 1995. The Union did not accept the proposal but expressed a willingness to bargain about various proposed alterations to the job classifications for employee nurses. VNS presented a "substantially identical" proposal on December 6, 1995, but this proposal also granted VNS "the sole and unqualified right to designate [job] classifications as it deemed necessary based on operational needs." Visiting Nurse Services, 1998 WL 414982, at *4.

On February 29, 1996, VNS again offered the Union a two-percent wage increase, effective retroactively to November

---

1. The following employees constituted a bargaining unit for collective-bargaining purposes within the meaning of § 9(b) of the Act:
   All full-time and regular part-time professional employees, including nurses, public health nurses, physical therapists, and social workers, employed by [VNS] at its Holyoke, Massachusetts[,] location, but exclud-
   ing office clerical employees, home health aides, managerial personnel, and guards and supervisors as defined in the Act.
   Visiting Nurse Services of Western Massachusetts, Inc., 325 N.L.R.B. No. 212, 159 L.R.R.M. (BNA) 1298, 1998 WL 414982, at *2 (July 20, 1998).

6, 1995, in return for the Union's agreement to its proposals for a bi-weekly payroll system and the job classification changes. The Union, acknowledging the broad opposition (within its membership) to the bi-weekly payroll system, rejected the proposal. *See id.* Nevertheless, on March 21, 1996, VNS notified the Union that "based on operational and economic realities [VNS] intend[ed] to implement 'both' the wage increase and the bi-weekly pay proposals that, to date, [VNS and the Union had] been unable to agree on." Five days later, the Union replied: "We oppose the unilateral implementation of the bi-weekly payroll system.... You have decided to tie your proposed two percent increase in employee wages to the implementation of a bi-weekly payroll system and we have rejected that combined proposal." VNS implemented the wage increase on April 7, 1996, and the bi-weekly payroll system on May 3, 1996.

On June 18, 1996, VNS presented another "package proposal." This proposal retained the earlier proposed job classification changes and included a second two-percent wage increase (to become effective July 7, 1996). The proposal also added three new provisions: 1) the transformation of three holidays into "floating" holidays to be taken at a time requested by the employee; 2) the implementation of a "clinical ladders" program;[2] and 3) the adoption of an enterostomal therapist classification and program.[3] On the same day, VNS also proposed a smaller, alternative package (the "mini package") which also included a second two-percent wage increase along with the above proposals on floating holidays and the clinical ladders and enterostomal therapist and classification programs.

The parties did not reach agreement on either proposal. In a letter dated August 20, 1996, VNS advised the Union that as of September 6, 1996, it was contemplating implementing the "mini package" and that "all of the above items [were] the 'positives' that [the parties] discussed that could be implemented while bargaining for a successor agreement continued." The Union responded on September 5, 1996: "We oppose the unilateral implementation of these proposals. The Union request[s] that you *not* make any changes to wages, hours or working conditions. Please do not hesitate to call me to arrange a meeting as soon as possible to discuss this and other outstanding issues." (Emphasis in original.)

VNS then sent a memorandum, dated September 13, 1996, to the bargaining unit employees (but not to the Union) informing them that it had implemented the mini package with the wage increase to be applied retroactively to July 7, 1996. Ten days later, VNS advised the Union that the wage increase had already been implemented and that the other programs (floating holidays, clinical ladders, and enterostomal therapist and classification) were "already in process." After emphasizing its view that these were "only 'positive items'" meant to enhance the staff's economic conditions while bargaining continued, VNS declared that "it [was] the Agency's position that the mini package involved ha[d] been properly implemented."

The Union filed a charge with the NLRB on September 30, 1996; it amended that charge on November 12, 1996. Based on these charges, the General Counsel of the NLRB issued a complaint against VNS

**2.** A company handout described "clinical ladders" as "practices and achievements that are above and beyond one's standard job performance." *Visiting Nurse Services,* 1998 WL 414982, at *6. It further explained that "[a] monetary incentive accompanies each Step Level.... Each individual that meets the criteria for a Step on the clinical ladder will receive a monetary reward, professional recognition, and certificate of achievement." *Id.*

**3.** An enterostomy is "the formation of a permanent opening into the intestine through the abdominal wall." R. Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 255 (1987).

on December 31, 1996, and amended that complaint on April 24, 1997.

## II

The NLRB order found that VNS violated §§ 8(a)(1) and (5) of the Act by unilaterally implementing 1) a bi-weekly payroll system on or about May 3, 1996; 2) changes in holidays on or about September 6, 1996; 3) a clinical ladder program on or about September 6, 1996; 4) an enterostomal therapist classification and program on or about September 6, 1996; and 5) changes in job classifications at some time subsequent to May 3, 1996. VNS made these changes while it was still bargaining with the Union and had not yet reached general impasse. *See Visiting Nurse Services*, 1998 WL 414982, at *11. There is no dispute that all of these are mandatory subjects of bargaining under § 8(d) of the Act.

Before the NLRB, the parties stipulated that they had not reached impasse in their bargaining on the agreement as a whole. Thus, under controlling law, because impasse had not been reached, the employer could take unilateral action on a mandatory subject of bargaining only under a narrow range of circumstances. *See N.L.R.B. v. Katz*, 369 U.S. 736, 741–43, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). No economic exigencies or business emergencies existed here which would warrant unilateral action. *See Visiting Nurse Services*, 1998 WL 414982, at *9; *see also N.L.R.B. v. Triple A Fire Protection, Inc.*, 136 F.3d 727, 739 (11th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 795, 142 L.Ed.2d 657 (1999) (noting that "[a] situation of economic necessity requires either a showing

of extenuating circumstances or a compelling business justification" (internal quotation marks omitted)). The NLRB found that the usual rule applied and there were no exceptions. *See Visiting Nurse Services*, 1998 WL 414982, at *9–10. The NLRB issued a broad remedial order based on a finding that VNS has a proclivity to violate the Act.[4] *See id.* at *13–14. One member dissented, finding the stipulated record insufficient, and would have remanded the matter to an administrative law judge for a full hearing. *See id.* at *16.

## III

■ We review the Board's conclusions of law de novo, *see N.L.R.B. v. Beverly Enterprises–Massachusetts, Inc.*, 174 F.3d 13, 21 (1st Cir. 1999) (citing the Administrative Procedure Act, 5 U.S.C. § 706), and take the Board's findings of fact to be "conclusive if supported by substantial evidence on the record considered as a whole." *Id.* (citing 29 U.S.C. § 160(e)).

VNS makes four arguments. First, it argues that the rule adopted by the Fifth Circuit in *N.L.R.B. v. Pinkston–Hollar Construction Services, Inc.*, 954 F.2d 306 (5th Cir.1992), should be adopted here and that this rule would excuse VNS's unilateral actions.

Second, VNS says the NLRB's determination that VNS in fact implemented the clinical ladders program and enterostomal therapist classification and program is not supported by substantial evidence. Accordingly, the issue was not ripe and should not have been the subject of an order.

---

4. In a decision issued two years before VNS's unilateral actions in the case at hand, the Board found that VNS had a proclivity to violate the Act and, therefore, merited a broad remedial order. "[VNS] is a repeat offender along a broad spectrum of Section 8(a)(1) conduct.... [VNS] has already had a bite of the apple. To fail to invoke a broad injunctive order is to invite further statutory misconduct." *Holyoke Visiting Nurses Ass'n*, 313 N.L.R.B. No. 182, 146 L.R.R.M. (BNA) 1047, 1994 WL 127305, at *27 n. 9 (Apr. 11, 1994) (citing this court's findings in *Holyoke Visiting Nurses Ass'n v. N.L.R.B.*, 11 F.3d 302 (1st Cir.1993)). VNS has changed its corporate name, and the parties have stipulated that VNS is identical to Holyoke Visiting Nurses Association. *See Visiting Nurse Services*, 1998 WL 414982, at *15 n. 1.

Third, VNS says it was error for the Board to accept as an amendment to the complaint any claims about the earlier implementation of the bi-weekly payroll. VNS says this is barred by the applicable limitations period in § 10(b) of the Act. The original unfair labor practice charge was filed by the Union on September 30, 1996, and included all the items at issue in this case save for the May 1996 installation of a bi-weekly payroll system. That charge was timely as to the claims alleged. The General Counsel issued a complaint pursuant to it. On November 12, 1996, that complaint was amended to include the bi-weekly payroll system implemented as of May 3, 1996. The NLRB's finding that the amended complaint claims were "closely related" to those in the original complaint is attacked.

Fourth, VNS argues that the Board's order is unenforceable because it required the employer to return only to a partial status quo ante, not the complete status quo ante. Under the Board's remedial order, the Union members' two two-percent wage increases are untouched, but the employer is required to rescind (at the Union's request) the other parts of its bargaining package which it wants and which it unilaterally implemented. VNS says this one-sidedness is particularly unfair since it needed the other items in the bargaining package in order to fund the pay raises. Such an order is punitive, says VNS, and the NLRB can only make remedial orders.

### A. Obligation To Bargain When No General Impasse Exists

■ Relying on the Fifth Circuit's decision in *Pinkston–Hollar*, VNS argues that once it had given the Union notice of its position on a particular issue and an opportunity to respond, it was free to unilaterally declare impasse on specific issues and to take action.

In response to the employer's contention, the Board held:

[A]s a general rule, when, as here, parties are engaged in negotiations for a collective-bargaining agreement, an employer's obligation to refrain from unilateral changes extends beyond the mere duty to provide a union with notice and an opportunity to bargain about a particular subject matter before implementing such changes. Rather, an employer's obligation under such circumstances encompasses a duty to refrain from implementing such changes at all, absent overall impasse on bargaining for the agreement as a whole. There are two limited exceptions to that general rule: (1) when a union, in response to an employer's diligent and earnest efforts to engage in bargaining, insists on continually avoiding or delaying bargaining, or (2) when economic exigencies or business emergencies compel prompt action.

*Visiting Nurse Services,* 1998 WL 414982, at *9 (internal footnotes omitted). The Board found that neither exception applied.

■ Both the Supreme Court and this court have affirmed the rule that unless the employer has bargained to impasse on the agreement as a whole, there is a violation of §§ 8(a)(1) and (5) if the employer makes unilateral changes in mandatory subjects of bargaining (subject to the very limited exceptions described above). *See Litton Fin. Printing Div. v. N.L.R.B.,* 501 U.S. 190, 198, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) (citing *N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)); *Rivera–Vega v. ConAgra, Inc.,* 70 F.3d 153, 162 (1st Cir.1995) (citing *Katz,* 369 U.S. at 743, 82 S.Ct. 1107). The doctrine applies where an existing contract has expired and the negotiations for a new one are not concluded. *See Litton,* 501 U.S. at 198, 111 S.Ct. 2215.

This court has long said that an employer must bargain to impasse before making a unilateral change. *See N.L.R.B. v. U.S. Sonics Corp.,* 312 F.2d 610, 615 (1st Cir. 1963). The basic principles were established in 1962 by the Supreme Court's

decision in *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Analogizing to the unlawful situation of a refusal to negotiate as to "any subject" within § 8(d) of the Act as to which the union seeks to negotiate, the Court held that:

an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal.

*Id.* at 743, 82 S.Ct. 1107. *Katz* also rejected the argument that subjective bad faith is required to find a § 8(a)(5) violation. *See id.* at 747. *Katz* involved a newly certified union and the failure to reach an initial agreement. *See id.* at 739–40, 82 S.Ct. 1107.

The Supreme Court has applied the *Katz* rule to situations, as here, where an existing agreement has expired but negotiations on a new one had not been completed. *See Laborers Health and Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 n. 6, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988). Further, in *Litton* the Court reaffirmed that "an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Litton*, 501 U.S. at 198, 111 S.Ct. 2215; *see also Beverly Enterprises–Massachusetts*, 174 F.3d at 25, 28–29 (describing the *Katz* rule); *Rivera–Vega*, 70 F.3d at 162 (applying the *Katz* rule).

■ We reject VNS's position that parties are at impasse merely because the Union rejects or does not accept the employer's position on a particular issue. "[M]ere rejection of a bargaining proposal does not create an impasse." *N.L.R.B. v. Central Plumbing Co.*, 492 F.2d 1252, 1254 (6th Cir.1974). Whether there is an impasse is an intensely fact-driven question, with the initial determination to be made by the Board. Our role is to review the Board's factual determinations to determine whether there is substantial evidence

in the record as a whole to support the Board's finding on impasse. There may be instances where one or two issues so dominate and drive the collective bargaining negotiations that the Board would be justified in finding that impasse on those one or two issues amounts to a bargaining deadlock. *Cf. American Federation of Television and Radio Artists, Kansas City Local v. N.L.R.B.*, 395 F.2d 622, 628 n. 13 (D.C.Cir.1968) (noting that "a deadlock on one critical issue can create as impassable a situation as an inability to agree on several or all issues"). But that is a far cry from this case. As this court has said, "[i]mpasse occurs when, after good faith bargaining, the parties are deadlocked so that any further bargaining would be futile." *Bolton–Emerson, Inc. v. N.L.R.B.*, 899 F.2d 104, 108 (1st Cir.1990).

The Supreme Court has commented on the difficulty of applying the concept of "impasse" to a given set of facts, noting: "perhaps all that can be said with confidence is that an impasse is a state of facts in which the parties, despite the best of faith, are simply deadlocked." *Laborers Health*, 484 U.S. at 543 n. 5, 108 S.Ct. 830 (quoting R. Gorman, *Basic Text on Labor Law, Unionization and Collective Bargaining* 448 (1976)) (internal quotation marks omitted).

■ The NLRB has similarly interpreted the scope of the statutory duty to bargain. Congress delegated to the Board, in § 8(d) of the Act, the responsibility to make that interpretation. *See Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 496, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979). The Board's interpretation is rational and consistent with the Act. *See Litton*, 501 U.S. at 200, 111 S.Ct. 2215 ("[I]f the Board adopts a rule that is rational and consistent with the Act ... then the rule is entitled to deference from the courts.") (quoting *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 42, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987) (internal quotation marks omitted)).

Collective bargaining involves give and take on a number of issues. The effect of VNS's position would be to permit the employer to remove, one by one, issues from the table and impair the ability to reach an overall agreement through compromise on particular items. In addition, it would undercut the role of the Union as the collective bargaining representative, effectively communicating that the Union lacked the power to keep issues at the table.

In rejecting another employer's argument that it could unilaterally change a term or condition of employment as soon as the union was notified of the intended change and given an opportunity to bargain, the NLRB stated:

> By utilizing this approach with respect to various employment conditions seriatim, an employer eventually would be able to implement any and all changes it desired regardless of the state of negotiations between the bargaining representative of its employees and itself.... [U]nder this approach, form, rather than substance, becomes the determinative factor in deciding whether the bargaining obligation has been fulfilled. In consequence, meaningful collective bargaining is precluded and the role of the bargaining representative is effectively vitiated.

*Winn–Dixie Stores, Inc.,* 243 N.L.R.B. No. 151, 101 L.R.R.M. (BNA) 1534, 1979 WL 9346, at *4 (Aug. 2, 1979). The Board's approach is both rational and consistent with the NLRA and so is entitled to deference. *See Litton,* 501 U.S. at 199, 111 S.Ct. 2215.

The *Pinkston–Hollar* case does not assist VNS. First, it is inconsistent with the approach taken by this Circuit. *See Rivera–Vega,* 70 F.3d at 162; *N.L.R.B. v. U.S. Sonics Corp.,* 312 F.2d 610, 615 (1st Cir. 1963). Second, the case is best understood as one where the court found that the

union failed to bargain and to act with due diligence after being given the employer's proposal. *See N.L.R.B. v. Triple A Fire Protection,* 136 F.3d 727, 738–39 (11th Cir. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 795, 142 L.Ed.2d 657 (1999). But VNS does not argue here that the Union avoided or delayed bargaining and so *Pinkston–Hollar* is, even on its own terms, inapplicable.

### B. *Ripeness*

VNS argues that it never actually finalized or implemented the clinical ladder program or the creation of an enterostomal therapist classification and program, and so these matters were not ripe for Board action. VNS says that the Board's contrary determination was not supported by substantial evidence. This court has explained that "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The reviewing court must consider the record in its entirety...." *Beverly Enterprises–Massachusetts,* 174 F.3d at 21 (internal quotation marks and citations omitted).

To find that VNS had in fact implemented these programs, the Board relies on a September 13, 1996, memorandum from VNS. That memorandum, as VNS argues, only establishes that the wage increase was being adopted. But on September 23, 1996, VNS sent out a letter (on which the Board also relies) saying that the remaining changes were "already in process." The Board also found that a registered nurse (who was a unit employee) was selected for the enterostomal therapy program and actually trained.[5] The Board also says that the job classification program was implemented before June 13, 1997.

VNS argues that because the September 23 letter explicitly concedes that the wage

---

**5.** VNS paid for all of her training and also paid her full regular wages during the entire period of training. In return, the nurse committed to at least 3 years of continued employment with VNS. *See Visiting Nurse Services,* 1998 WL 414982, at *7.

increase had already been adopted (or "rolled in"), the language describing the remaining changes as being merely "in process" must mean that those changes had not yet been "finalized." The phrase "in process" (or "into process") appears twice in the September 23 letter:

> As we [VNS] had pointed out in our notice to the Union, implementation was contemplated for 9/6/96. The items involved are items that had to be put *into process* for implementation on the 6th. Accordingly, by the time you contacted us we had already prepared the payroll with the increase rolled in. In addition, the other programs are also items that we had to prepare for in advance and they too are already *in process*.

(Emphasis added.) VNS's interpretation of this language sees a material difference between the implementation of the wage increase (which VNS concedes) and the implementation of the other changes (which VNS disputes). We reject such a strained reading.

To begin, VNS's interpretation misses the relevant legal question: the issue here is whether, in the absence of a general impasse, VNS unilaterally adopted or implemented the programs still under negotiation, *not* whether VNS had already fully *executed* the programs. *Cf. Winn–Dixie, Inc.*, 1979 WL 9346, at *4 (stating that an employer may not unilaterally "implement" changes absent an impasse). A sentence from the last paragraph of the letter speaks directly to this question by stating "the Agency's [VNS's] position that *the mini package* involved *ha[d] been properly implemented*" (emphasis added). This indicates that VNS had already made the decision—had already taken unilateral action—to implement the proposed programs that were still under negotiation.

That these changes were merely "in process" on September 23, 1996, does not alter our conclusion. Contrary to VNS's interpretation, the letter indicates that the entire mini package had already been adopted and the only remaining question

was when the other programs would actually "roll in." The facts surrounding the implementation of the enterostomal therapist program bolster our view. On October 7, 1996, merely two weeks after sending the September 23 letter, VNS paid for a unit employee nurse to begin her training in the enterostomal therapist program, one of the other programs included in the mini package.

It is, in fact, unlikely that any program could be "in process" without VNS first *adopting* the new program and setting in motion the gears that would eventually effectuate that program. The Board concluded that that is what happened in this case, and we see ample and substantial evidence to support its finding. *Accord Beverly Enterprises–Massachusetts*, 174 F.3d at 21–22 (noting that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" (internal quotation marks omitted)).

## C. *Timeliness*

■■■■ The amendment to the complaint to cover the May 1996 implementation of a bi-weekly payroll system is not time-barred. Section 10(b) of the Act provides both that a *charge* must be filed within six (6) months of the unfair labor practice in order for a *complaint* to issue and that the Board may, in its discretion, provide for amendment of the complaint at any time before the order issues. *See* 29 U.S.C. § 160(b). Indeed, this six-month rule does not apply to the issuance of an amendment to a complaint, but only to the filing of a charge. *See Truck Drivers & Helpers Union, Local No. 170 v. N.L.R.B.*, 993 F.2d 990, 1000 n. 12 (1st Cir.1993). There is no dispute that the initial charges were timely.

The NLRB permits amendment when the new charges are closely related to the original timely charges. Courts liberally interpret the NLRB's power to amend a

complaint. *See Eastern Maine Medical Center v. N.L.R.B.*, 658 F.2d 1, 6 (1st Cir.1981) (noting that § 10(b)'s grant of discretion to amend a complaint "has been interpreted liberally to allow the relation back of amendments alleging acts that are part of the same general course of conduct as the acts alleged in the charge and within the same time frame" (footnote omitted)). "A complaint based on a timely filed charge may be amended to include other allegations if they are 'closely related' to the underlying timely charge and occurred within six months of the charge." *Truck Drivers*, 993 F.2d at 1000 n. 12. The test for determining whether alleged unfair labor practices are "closely related" is this:

> First, the Board will look at whether otherwise untimely allegations involve the same legal theory as the allegations in the pending timely charge. Second, the Board will look at whether the otherwise untimely allegations arise from the same factual circumstances or sequence of events as the pending timely charge. Finally, the Board will look at whether a respondent would raise similar defenses to both allegations.

*Id.* at 1000.

The Board was correct to find that the unilateral change in the payroll system was closely related to the timely charges about the unilateral changes in wages and hours. First, the bi-weekly payroll system allegations are based on the same legal theory as the remaining allegations—namely, that VNS sought to circumvent the collective-bargaining process by making unilateral changes. *See N.L.R.B. v. Fant Milling Co.*, 360 U.S. 301, 307, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959) (noting that allegations that involve "the same class of violations as those set up in the charge" may be included in the complaint). In fact, the allegations are based on the same section of the Act, § 8(a)(5), a fact that reflects closer legal proximity than the law requires. *See Truck Drivers*, 993 F.2d at 1001 ("With respect to the similarity between the legal theories underlying each charge, it is clear that the allegations need not be under the same statutory section. It is sufficient that both charges are part of the same effort or crusade against the union." (internal citations omitted)).

Second, the payroll system allegations arose from the same factual circumstances and sequence of events: the proposed payroll system was introduced within the same series of package proposals that included the other unilateral changes, and all of these changes occurred during the same period (from May to September 1996) during which the parties were negotiating. *See Truck Drivers*, 993 F.2d at 1001 ("Charges will be found closely related factually if they arise from the same sequence of events." (internal quotation marks omitted)).

Finally, the Board properly found that VNS would raise similar defenses to both sets of charges—charges based on the same statutory provision and fueled by the same legal theory. *See N.L.R.B. v. Overnite Transp. Co.*, 938 F.2d 815, 820 (7th Cir.1991) (noting that a court should examine "whether a reasonable respondent would have preserved similar evidence and prepared a similar case in defending against the allegations in the timely pending charge").

## D. *Remedy*

██ VNS complains that the Board's rescission order in this case is beyond the Board's jurisdiction, is punitive, and improperly compels VNS to make concessions. To support this argument, VNS explains that the Board's order that VNS rescind the unlawful changes (at the Union's request) and return to the "status quo" would leave the two two-percent wage increases in place, thereby punishing VNS and forcing it to make concessions.

The Board has "the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act," and that discretion is "subject only to limited

judicial review." *Sure–Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 888–89, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); *see also Pegasus Broadcasting of San Juan, Inc. v. N.L.R.B.*, 82 F.3d 511, 513 (1st Cir.1996). "A Board-ordered remedy 'should stand unless it can be shown that [it] is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *Pegasus*, 82 F.3d at 513 (quoting *Virginia Elec. & Power Co. v. N.L.R.B.*, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943)).

The Board justifies its order by saying there was never an unfair labor practice charge filed about the wage increases and so there is no occasion to take action on them. It is no surprise that the Union did not complain about the wage increases. While unilateral wage increases given by the employer in the face of a union organizing or recognition campaign have been the subject of unfair labor practice charges, *see, e.g., N.L.R.B. v. Wis–Pak Foods, Inc.*, 125 F.3d 518, 525–26 (7th Cir.1997) (upholding the NLRB's determination that the post-election grant of a wage increase was motivated by a desire to erode union support and was therefore an unfair labor practice), that is not the context here.

The employer here played a risky hand in its tactics, a hand contrary to the prevailing law. In the quid pro quo of collective bargaining, that employees may keep the quid of wage increases while the employer may not keep the quo of the rest of the package is the consequence of the employer's decision to unilaterally remove these subjects from bargaining and implement them without union agreement. There is nothing punitive about the Board's decision not to act on the wage increases in the absence of an unfair labor practice charge.

For the foregoing reasons we dismiss VNS's petition and we grant the cross-petition of the NLRB to enforce the Board's order.