In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1626, 00-2032

Duffy Tool & Stamping, L.L.C.,

Petitioner/Cross-Respondent,

v.

National Labor Relations Board,
Respondent/Cross-Petitioner,

and

International Union, United Automobile,
 Aerospace, and Agricultural Implement
 Workers of America, AFL-CIO,

Intervenor.

Petition to Review and Cross-Petition
to Enforce Order of the
National Labor Relations Board.

Argued October 23, 2000--Decided December 1, 2000


 Before Posner, Diane P. Wood, and Williams, Circuit
Judges.

 Posner, Circuit Judge.  When a union wins an election to be the exclusive bargaining representative of a group of workers, the employer becomes duty-bound to bargain in good faith with the union. 29 U.S.C. sec. 158(a)(5). The aim of the bargaining process is to negotiate a collective bargaining agreement that will define the terms and conditions of employment of the represented workers during the term of the agreement. There is no duty to agree, however, and if the parties deadlock (reach "impasse," in the jargon of labor law), the employer is free to operate his business as he did before bargaining began, and therefore he may alter the terms and conditions of the workers' employment. E.g., Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 198 (1991); Lapham-Hickey Steel Corp., 904 F.2d 1180, 1185 (7th Cir. 1990). He can also do this if the union takes steps to delay or avoid bargaining or if the alteration is necessary to avoid serious hardship to the employer. E.g., Vincent Industrial Plastics, Inc. v. NLRB, 209 F.3d 727, 734 (D.C. Cir. 2000); Visiting Nurse Services of Western Mass., Inc. v. NLRB, 177 F.3d 52, 57-58 (1st Cir. 1999). But if there is no

deadlock, no foot-dragging by the union, and no exigency requiring an immediate change in the terms or conditions of employment to stave off disaster, the employer may not make such a change unilaterally. Litton Financial Printing Div. v. NLRB, supra, 501 U.S. at 198. This is an important rule. The overriding goal of federal labor law is labor peace, and is promoted when the parties to a labor dispute avoid a test of strength involving a strike or a lockout by negotiating a collective bargaining agreement, which will standardly include a no-strike clause, thus assuring labor peace during the term of the agreement (usually three years) and setting the stage for future renewals of the agreement. Anything that interferes with the negotiation process and makes reaching agreement less likely interferes with this goal.

It is against this policy background that we consider the employer's argument in this case, which is that it is free to make unilateral changes in the terms and conditions of its workers' employment as soon as the parties reach deadlock on any issue in the negotiation. The union won an election back in October of 1996. During the course of the ensuing negotiations, the company put forward a proposal to institute a "no fault" attendance policy under which a tardy worker would get a certain number of points for every incident of tardiness, regardless of whether he was at fault, and if he accumulated a specified number of points could be fired. The company's existing attendance policy was more lenient. The union opposed the proposal. The employer declared an impasse and on January 1, 1998, put the new policy into effect and later fired some workers who might not have been fired under the old policy. The Board found that while the parties may have been deadlocked over the "no fault" policy by the beginning of 1998, they were not yet deadlocked on all the mandatory issues for collective bargaining; they had not reached an "overall impasse." The employer disagrees that it had not yet reached an overall impasse with the union, but there is enough evidence to support the Board's conclusion, leaving the employer to argue that piecemeal impasse, the deadlock over the proposed new attendance policy, was enough to free Duffy to implement the proposal.

Decisions of the Fifth Circuit support this position. NLRB v. Pinkston-Hollar Construction Services, Inc., 954 F.3d 306, 311-12 (5th Cir. 1992); Nabors Trailers Inc. v. NLRB, 910 F.2d 268, 273 (5th Cir. 1990); Winn-Dixie Stores, Inc. v. NLRB, 567 F.2d 1343, 1349-50 (5th Cir. 1978); NLRB v. J.P. Stevens & Co., 538 F.2d 1152, 1162 (5th Cir. 1976); A.H. Belo Corp. v. NLRB, 411

F.2d 959, 971 (5th Cir. 1969); NLRB v. Tex-Tan, Inc., 318 F.2d 472, 480-81 (5th Cir. 1963). Though only Winn-Dixie and Belo involved neither foot-dragging by the union nor financial exigencies compelling the employer to make the change immediately, cf. Visiting Nurse Services of Western Mass., Inc. v. NLRB, supra, 177 F.3d at 59; NLRB v. Triple A Fire Protection, Inc., 136 F.3d 727, 738-39 (11th Cir. 1998), all the cases make clear the Fifth Circuit's belief that an employer is free to make a unilateral change upon sufficient notice to enable the union to discuss its objections with the employer, even if the parties are in the midst of bargaining. The Board, however, has repeatedly rejected the Fifth Circuit's doctrine, RBE Electronics of S.D. Inc., 320 N.L.R.B. 80, 81-82 (1995); Intermountain Rural Electric Ass'n, 305 N.L.R.B. 783, 786 (1991), enforced, 984 F.2d 1562 (10th Cir. 1993); Master Window Cleaning, Inc., 302 N.L.R.B. 373, 379 (1991), enforced, 15 F.3d 1087 (1994); Winn-Dixie Stores, Inc., 243 N.L.R.B. 972, 974 (1979), and other circuits have sided with the Board, Vincent Industrial Plastics, Inc. v. NLRB, supra, 209 F.3d at 735; Visiting Nurses Services of Western Mass., Inc. v. NLRB, 177 F.3d at 58; NLRB v. Central Plumbing Co., 492 F.2d 1252, 1254 (6th Cir. 1974), rightly in our view.

The employer's position would empty the duty to bargain of meaning, and this in two respects: (1) by removing issues from the bargaining agenda early in the bargaining process, it would make it less likely for the parties to find common ground; (2) by enabling the employer to paint the union as impotent, it would embolden him to hold out for a deal so unfavorable to the union as to preclude agreement.

(1) A negotiation is more likely to be successful when there are several issues to be resolved ("integrative bargaining") rather than just one, because it is easier in the former case to strike a deal that will make both parties feel they are getting more from peace than from war. Howard Raiffa, The Art and Science of Negotiation 97-103, 131-32 (1982). If the only thing at issue in a labor negotiation is wages, that is, money, the parties are playing a zero-sum game: a dollar more in wages is a dollar gained by the union but a dollar lost by the employer. But suppose a dues checkoff is also at issue. Since it probably is worth more to the union not to have to dun the workers for their union dues than it costs the employer to deduct the dues from the worker's paycheck and remit them to the union, the union may be willing to give a little in bargaining over wages in order to get the dues checkoff. Similarly, the employer may be willing to "pay" for a no-strike clause by agreeing to a grievance

procedure jointly administered by the union and the employer, and that may be a concession that the union very much wants in order to give the workers a sense that the union is protecting them from arbitrary discipline by the employer. With both parties eager for this trade, it may be easier for them to compromise on other issues. The particular trade creates value that can be used to fund, as it were, other concessions by both sides, bringing the parties nearer to the state in which both feel better off with an agreement than with a strike.

The employer points out that the implementation of a proposal need not remove it from the negotiation, since it can always be rescinded. The point is literally but not practically correct. The employer may be able to make implementation irrevocable as a practical matter by sinking heavy costs in the implementation and thus committing himself to stay the course, for example by laying off a number of workers pursuant to the adopted proposal and hiring permanent replacements under contracts providing for generous severance benefits. In addition, the employer will be reluctant to lose face with the workers by abandoning a measure that it put into effect during the negotiation to show (see next paragraph) that the union could do nothing for them, and he may also fear that if he renegotiates after declaring a deadlock it will strengthen the union's contention in the ensuing proceedings before the Labor Board that the parties had not in fact deadlocked.

(2) If by deadlocking on a particular issue the employer is free to implement his proposal with regard to that issue, he signals to the workers that the union is a paper tiger. Vincent Industrial Plastics, Inc. v. NLRB, supra, 209 F.3d at 735; Visiting Nurses Services of Western Mass., Inc. v. NLRB, supra, 177 F.3d at 59. This is especially true when as in this case the proposal reduces the workers' job security compared to what it was before the election. It makes it look as if the workers are actually worse off as the result of the election--which of course is what the employer, looking forward to a possible strike vote and to the eventual decertification of the union, wants them to think. By undermining support for the union, the employer positions himself to stiffen his demands in what remains of the bargaining process, knowing that if the process breaks down the union may be unable to muster enough votes to call a strike. This stiffening of terms is likely to cause the process to break down, since the union cannot afford, by moderating its own demands, to acknowledge that it is indeed a paper tiger.

There is a further and we think conclusive objection to the employer's position. There really is no such animal as a deadlock on a single issue in a multifaceted negotiation; or if there is it is vanishingly rare, a truly endangered species. Nothing is more common during a negotiation than for one or both parties to make nonnegotiable demands. Usually this is bluffing, since if the negotiation is truly multifaceted, there is generally a price at which the parties will surrender these demands. Anyone who has been involved in a negotiation knows this. Suppose you're negotiating with a builder over the terms for the construction of a house. You are very concerned about delay and ask that he agree to include a liquidated-damages clause that will obligate him to reduce the contract price by $100 for every day that completion is delayed beyond six months from the signing of the contract. He refuses indignantly, saying that he never agrees to a damages-for-delay clause, that the risk is too great given the uncontrollable contingencies of construction, that you should find someone else to build your house. You would be foolish to take this emphatic refusal at face value, as creating an impasse that placed the issue beyond negotiation. Raiffa, supra, at 142–45. You would probably come back to him with an offer to extend the deadline for completion, or to accept a somewhat higher purchase price to compensate him for assuming the risk of delay, or to reduce the amount of per diem damages.

That is doubtless the case here as well. It is inconceivable that the employer is so wedded to a "no fault" attendance policy--an idea that first occurred to it during the negotiation--that it would not abandon the policy in exchange for a suitable concession in some other term of the collective bargaining agreement. Not that an employer has no legitimate concern with absenteeism; of course it does; but until the union came on the scene the employer had not thought a "no fault" policy the right way to deal with the problem. Suppose the workers care above all about their job security and are therefore desperate to have any discharges for absenteeism governed by a "for cause" rather than a "no fault" standard. Then the employer might be able to extract generous concessions in exchange for backing down from his demand. An unreasonable refusal to even consider backing down from a demand plainly not central to the employer's business or labor relations would itself be a sign of bad faith. See NLRB v. Wright Motors, Inc., 603 F.2d 604, 608-10 and n. 5 (7th Cir. 1979); NLRB v. A-1 King Size Sandwiches Inc., 732 F.2d 872, 877-78 (11th Cir. 1984); NLRB v. Patent Trader, Inc., 415 F.2d 190, 198 (2d Cir. 1969), modified on other grounds, 426 F.2d 791 (2d Cir.

1970) (en banc); NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (1st Cir. 1953); see also Federal Mogul Corp., 212 N.L.R.B. 950, 951 (1974), enforced, 524 F.2d 37 (6th Cir. 1975).

  For all these reasons, we think the Board is on sound ground in insisting that the employer bargain until it is plain that the parties are deadlocked in the negotiation as a whole, a point not reached here. As for the employer's complaint that the provision of the Board's remedy that seeks to restore the status quo by rescinding the "no fault" attendance policy and reinstating the workers fired under it will require the reinstatement of the workers that the company would have fired even under the previous, more lenient policy, we do not read the order so. The order directs the company to reinstate with backpay employees "discharged, suspended, or otherwise denied work opportunities as a result of the work rules" (emphasis added). The order is not intended to make any worker better off than he would have been had the company not violated the law by instituting the new attendance policy before it had bargained to impasse.

  The petition for review is denied, and the cross-petition to enforce the Board's order is granted.